Arminta Jane MULLINS, Appellant,

v.

Phyllis Dianne PICKLESIMER,
Appellee.

No. 2008–SC–000484–DGE.

Supreme Court of Kentucky.

Jan. 21, 2010.

As Modified on Denial of Rehearing
Aug. 26, 2010.

William R. Erwin, Helton, Erwin & Associates, Danville, KY, Counsel for Appellant.

Robin Renee Slater, Lexington, KY, Counsel for Appellee.

Opinion of the Court by Justice SCHRODER.

We are called upon to determine whether the trial court erred in awarding joint custody of a child to the biological mother and her former same-sex partner. We adjudge that the trial court properly granted CR 60.02 relief regarding the parties' agreed judgment of custody on grounds that it was based on falsified evidence and fraud. We further adjudge that the trial court properly found that Appellant had standing to seek custody of the child and that the natural mother waived her superior right to sole custody of the child in favor of a joint custody arrangement with Appellant. Hence, we affirm the Court of Appeals in part as to the parties' agreed judgment of custody, and reverse in part as to its finding of no waiver and reinstate the judgment of the Garrard Circuit Court.

Phyllis Dianne Picklesimer (hereinafter "Picklesimer") and Arminta Jane Mullins (hereinafter "Mullins") were involved in a relationship and lived together as a couple for nearly five years. During that time, the couple decided they wanted to have a baby Picklesimer and Mullins worked together to find a sperm donor that had characteristics closest to Mullins. Once a sperm donor was chosen, Picklesimer was artificially inseminated and became pregnant. Mullins was present for the insemination of Picklesimer.

The pregnancy was difficult and Picklesimer was hospitalized for the last month

of the pregnancy. On May 31, 2005, Zachary Alexander Picklesimer–Mullins was born. Mullins and her mother, Nancy Mullins, were present for the birth. The parties jointly made the decision regarding the child's surname, and the name Zachary Alexander Picklesimer–Mullins was listed on the birth certificate.

The parties had difficulty with their relationship during the pregnancy and separated for a short time. Picklesimer claimed Mullins had an affair during this time, which Mullins denied. The parties reconciled prior to the birth of Zachary, continuing with their plan to raise the child together as a family.

Zachary was born two months premature, which resulted in the infant being placed in the neonatal unit of the hospital for two months. During this time, both parties went to the hospital to provide care for Zachary.

Mullins works as a police detective, and Picklesimer is employed as a nurse. After Picklesimer's maternity leave was up, Mullins took a one-month leave to care for the baby. It is undisputed that both parties provided for the care and financial support of Zachary. Zachary began calling Picklesimer "mommy" and Mullins "momma." When both parties went back to work, Mullins' mother took care of Zachary while they were at work.

As Zachary became older, Mullins became concerned regarding her legal rights to Zachary. She expressed this concern with Picklesimer, specifically what rights would she have to Zachary if something happened to Picklesimer or if Zachary needed medical treatment. Mullins ultimately contacted attorney William Erwin concerning her legal rights. Mullins and

Picklesimer met with Erwin on two occasions. On the first occasion, Erwin discussed with them their legal rights regarding the care of Zachary and the legal documents that could protect Mullins' interest regarding Zachary. Picklesimer testified that Erwin specifically informed her that he was representing Mullins only in the matter. Picklesimer and Mullins met with Erwin a second time to review and sign the legal documents that he had drafted. It is undisputed that the parties signed the following documents on January 20, 2006: petition for custody; entry of appearance and consent to custody; and agreed judgment of custody. The documents stated that Mullins was the de facto custodian of Zachary—that Mullins was his primary caregiver and primary financial supporter for a period of time not less than six months from the date of his birth.

Even though the parties were living in Lincoln County, the petition and entry of appearance were filed in the Garrard Circuit Court without objection by either party. Without an evidentiary hearing, depositions, or any form of evidence taken prior thereto, the trial court signed the agreed judgment and entered the same on February 3, 2006. No appeal was filed from this judgment.

The parties lived together with Zachary until either some time in February, after the agreed judgment was entered, or until April of 2006.[1] However, until September 2006, the parties continued to exercise timesharing on an equal basis with Zachary. Some time in September 2006, Picklesimer refused to allow Mullins to have any further contact with Zachary unless Mullins visited him at Picklesimer's home. Picklesimer testified that Mullins had violated their verbal agreement to not leave

---

1. Picklesimer testified that Mullins left her the day after the agreed judgment was entered. Mullins testified that while the parties were having problems in February 2006, the relationship did not end until April of 2006.

Zachary with anyone other than a family member. Mullins maintained that Picklesimer refused to allow her to see Zachary because she had a problem with Mullins' new relationship with another woman. Picklesimer admitted she had a problem with Mullins' new relationship with another woman and admitted to telling Mullins, "We had him for us, not for you and her" and "I'm not going to share him with you to have a life of your own."

As a result of being denied visitation with Zachary, Mullins filed a motion for joint care, custody and control of Zachary and requested that she be declared his primary residential custodian. Picklesimer responded with a motion to dismiss, arguing lack of jurisdiction and improper venue. In the alternative, Picklesimer filed a motion to set aside the agreed judgment of custody pursuant to CR 60.02 on grounds that it was based on fraud or mistake. Prior to the hearing on these motions, Mullins filed a motion for sole custody of Zachary because Picklesimer unilaterally withheld Zachary from Mullins and was not acting in the best interests of Zachary.

The trial court referred the matter to a domestic relations commissioner ("DRC") who held a hearing on the issues on November 6, 2006. Picklesimer, Mullins, and Mullins' mother were the only witnesses at the hearing. The DRC subsequently issued his findings of fact, conclusions of law, and recommendations. The DRC granted Picklesimer's motion to set aside the agreed judgment on grounds of Mullins' failure to qualify as a de facto custodian, but found that Picklesimer waived her superior right to custody in favor of Mullins as a joint custodian. The DRC then recommended that the parties be awarded joint custody of Zachary, with Picklesimer being designated primary residential custodian. Both parties filed exceptions to the DRC's report. On December 1, 2006, the trial court overruled both parties' exceptions and adopted the findings of fact and recommendations of the DRC.

Picklesimer appealed to the Court of Appeals, and Mullins filed a cross-appeal. Picklesimer argued on appeal that the Garrard Circuit Court lacked jurisdiction and venue to issue the custody order, that Mullins lacked standing to pursue custody, and that the trial court erred in finding that she waived her superior right to custody. Mullins argued that the trial court erred in granting the CR 60.02 motion invalidating the February 3, 2006 agreed judgment of custody. The Court of Appeals rejected Picklesimer's argument that the Garrard Circuit Court lacked jurisdiction and venue. The Court of Appeals also rejected Mullins' argument that the trial court erred in setting aside the agreed judgment of custody, agreeing with the trial court that the agreed judgment was invalid because Mullins did not qualify as a de facto custodian under KRS 403.270. However, the Court of Appeals reversed the trial court's finding that Picklesimer waived her superior right to custody of Zachary. Because the Court adjudged that Mullins was not Zachary's de facto custodian and Picklesimer had not waived her superior right to custody, the Court of Appeals concluded that Mullins did not have standing to pursue custody of Zachary. The case is now before us upon the granting of Mullins' motion for discretionary review.

## STANDING

■ At the outset, we note that to qualify as a de facto custodian in Kentucky, one must be "the primary caregiver for, and financial supporter of, a child who has resided with the person for a period of six (6) months or more if the child is under three years of age...." KRS 403.270(1)(a).

It has been held that parenting the child alongside the natural parent does not meet the de facto custodian standard in KRS 403.270(1)(a). *Consalvi v. Cawood*, 63 S.W.3d 195, 198 (Ky.App.2001), *abrogated on other grounds by Moore v. Asente*, 110 S.W.3d 336 (Ky.2003). Rather, the non-parent must "literally stand in the place of the natural parent." *Id.* Although Mullins was providing care and financial support for Zachary, it was undisputed that Mullins did not have de facto custody status regarding Zachary because she was co-parenting the child with Picklesimer. Picklesimer maintains that once the court determined Mullins was not a de facto custodian, Mullins no longer had standing to pursue custody on any other grounds. We disagree.

Prior to 2004, standing to bring a custody action was limited by KRS 403.240 to "a parent, a de facto custodian of the child, or a person other than a parent only if the child is not in the physical custody of one of the parents." *B.F. v. T.D.*, 194 S.W.3d 310, 310–11 (Ky.2006) (partner who lived with mother and mother's adopted child for six years as a family did not have standing to seek custody because the child was in the physical custody of the legal parent.)[2]; *Moore*, 110 S.W.3d at 355–56. However, KRS 403.270 *et seq.*, the Uniform Child Custody Jurisdiction Act, was repealed in 2004 and replaced by KRS 403.800 *et seq.*, the Uniform Child Custody Jurisdiction and Enforcement Act. KRS 403.822, provides as follows:

> (1) Except as otherwise provided in KRS 403.828, a court of this state shall have jurisdiction to make an initial child custody determination only if:
> (a) This state is the home state of the child on the date of the commencement of the proceeding, or was the home state

of the child within six (6) months before the commencement of the proceeding and the child is absent from this state but a parent or person acting as a parent continues to live in this state; or

> (b) A court of another state does not have jurisdiction under paragraph (a) of this subsection, or a court of the home state of the child has declined to exercise jurisdiction on the ground that this state is the more appropriate forum under KRS 403.834 or 403.836; and
> 1. The child and the child's parents, or the child and at least one (1) parent *or a person acting as a parent*, have a significant connection with this state other than mere physical presence; and
> 2. Substantial evidence is available in this state concerning the child's care, protection, training, and personal relationships; or
> (c) All courts having jurisdiction under paragraph (a) or (b) of this subsection have declined to exercise jurisdiction on the ground that a court of this state is the more appropriate forum to determine the custody of the child under KRS 403.834 or 403.836; or
> (d) No court of any other state would have jurisdiction under the criteria specified in paragraph (a), (b), or (c) of this subsection.
> (2) Subsection (1) of this section is the exclusive jurisdictional basis for making a child custody determination by a court of this state.
> (3) Physical presence of, or personal jurisdiction over, a party or a child is not necessary or sufficient to make a child custody determination.

(emphasis added). The current statute confers standing on the child's parent(s) or

---

KRS 403.420 because the suit was filed in 2003 before KRS 403.800 *et seq.* was enacted.

"a person acting as a parent." KRS 403.800(13) defines "a person acting as a parent" as:

a person, other than a parent, who:

(a) Has physical custody of the child or has had physical custody for a period of six (6) consecutive months, including any temporary absence, within one (1) year immediately before the commencement of a child custody proceeding; and

(b) Has been awarded legal custody by a court or claims a right to legal custody under the law of this state;

As used in KRS 403.800 to KRS 403.880, "physical custody" means "physical care and supervision of a child." KRS 403.800(14). This statutory definition of "physical custody" does not require exclusive care and exclusive supervision. Thus a person like Mullins, who for the requisite period of time performed all the traditional parental responsibilities, concurrently with another or on an equal time sharing basis, had "physical custody" under the provisions of KRS 403.800 *et seq.*

 "It is presumed that the Legislature was cognizant of preexisting statutes at the time it enacted a later statute on the same subject matter." *Shewmaker v. Commonwealth,* 30 S.W.3d 807, 809 (Ky. App.2000). Instead of requiring that the child *not* be in the physical custody of the parent as KRS 403.240 did, the new statute grants standing to a nonparent who, acting as parent to the child, has physical custody of the child. Hence, KRS 403.822 would seem to permit standing in a shared custody co-parenting situation, since there is no longer a requirement of physical custody to the exclusion of the parent, if the nonparent can meet one of the requirements of subsection (b) of KRS 403.800(13)—she has been awarded legal custody or claims a right to legal custody under Kentucky law.

Although KRS 403.822 directly addresses the issue of the court's jurisdiction to make an initial custody determination, by identifying the adult persons who must be present in the forum state for jurisdiction to arise (parent or person acting as a parent), the statute implicitly identifies those persons as parties who may bring an action seeking initial custody of the child. It would make little sense to confer jurisdiction to this state when only "a person acting as a parent" resides here, and not at the same time confer standing upon that person to assert initial custody of the child. Otherwise, the state would have jurisdiction of the matter without any resident of the state having standing to bring an action to assert initial custody in the forum. That would clearly be an unreasonable interpretation of the statute, and is one which we believe our legislature did not intend. Moreover, it would make little sense for a person acting as a parent to have standing only if there is a jurisdictional dispute about which is the proper forum state, but not to have standing when there is not a jurisdictional dispute. Again, this would produce an unreasonable result.

Several of our sister states have found that the nonparent has standing to seek custody or visitation of the child when the child was conceived by artificial insemination with the intent that the child would be co-parented by the parent and her partner, and the parent and her partner had thereafter co-parented the child for a period of time. *See, e.g., In re Parentage of L.B.,* 155 Wash.2d 679, 122 P.3d 161 (2005) (partner had standing as a common law de facto parent which was limited to nonparents who have fully and completely undertaken a permanent, unequivocal, committed, and responsible parental role in the child's life); *J.A.L. v. E.P.H.,* 453 Pa.Super. 78, 682 A.2d 1314 (1996) (mother's former domestic partner stood in loco par-

entis with child and, therefore, had standing to seek partial custody of child born during their relationship); *In re Custody of H.S.H.-K.*, 193 Wis.2d 649, 533 N.W.2d 419 (1995) (nonparent has standing to seek visitation of child if a parent-like relationship with the child is shown); *A.C. v. C.B.*, 113 N.M. 581, 829 P.2d 660 (N.M.Ct.App. 1992) (former partner who had entered into oral co-parenting agreement had standing to seek joint legal custody and time-sharing of partner's biological child).

The facts in *J.A.L. v. E.P.H.*, are nearly identical to those in the case at hand. The parties jointly made the decision to bring a child into the world through artificial insemination, entered into a co-parenting agreement, and thereafter lived together with the child as a family for ten months, with both parties providing for the care and financial support of the child. *Id.* at 1316–17. Subsequently, the parties separated, but, per agreement of the parties, the mother's former partner continued to have visitation of the child for two years after the separation. *J.A.L.*, 682 A.2d at 1317–18. The Court adjudged that the mother's former partner had standing as a result of the parent-like relationship that was allowed to develop between the former partner and the child through "the participation and acquiescence of the natural parent." *Id.* at 1321.

> [W]e hold that the fact that the petitioner lived with the child and the natural parent in a family setting, whether a traditional family or a nontraditional one, and developed a relationship with the child as a result of the participation and acquiescence of the natural parent must be an important factor in determining whether the petitioner has standing.
>
> . . .
>
> The facts as found by the trial court clearly indicate that E.P.H. and J.A.L.

had lived together not merely as roommates or friends, but as a nontraditional family, for many years before the birth of the child. E.P.H.'s own testimony establishes that although she had long wished to have a child, she did not do so until J.A.L. agreed, and thereafter the parties acted together to make arrangements for the artificial inseminations. The inescapable conclusion to be drawn from this evidence is that in both E.P.H.'s and J.A.L.'s minds, the child was to be a member of their nontraditional family, the child of both of them and not merely the offspring of E.P.H. as a single parent. This intention is borne out by the documents executed by the parties before the child's birth and by E.P.H.'s conduct in giving the child J.A.L.'s surname as a middle name on the birth certificate. Clearly, the parties contemplated that J.A.L. would be in a parent-like relationship with the child and took some pains to formalize that relationship to the extent legally possible.

*Id.*

In the present case, the child was conceived through artificial insemination and brought into the world upon agreement of the parties to parent the child together. It was undisputed that Mullins physically cared for and supervised Zachary from birth throughout the period the parties were together and for the five months thereafter when they shared custody. And she did so in the capacity of a parent, which is evidenced by her living as a family with the child and Picklesimer, the child calling her "momma," the child's hyphenated surname (Picklesimer–Mullins), the parties' attempt to confer parental rights on Mullins with the agreed judgment of custody, and Picklesimer continuing to allow Mullins to co-parent to the child for some five months after the parties' rela-

tionship dissolved. This would distinguish the nonparent acting as a parent to the child from a grandparent, a babysitter, or a boyfriend or girlfriend of the parent, who watched the child for the parent, but who was never intended by the parent to be doing so in the capacity of another parent. Further, Mullins claimed a right to legal custody of Zachary under the agreed judgment of custody, thereby satisfying the requirement of KRS 403.800(13)(b). Accordingly, we adjudge that Mullins has standing in this case to seek custody of Zachary.

### AGREED JUDGMENT OF CUSTODY

■ Mullins argues that regardless of the fact that she could not qualify as Zachary's de facto custodian under the law, the trial court erred in setting aside the agreed judgment pursuant to CR 60.02. CR 60.02(c) allows a court to grant relief from a judgment on grounds of "perjury or falsified evidence[,]" and Section (d) permits relief if there was "fraud affecting the proceedings, other than perjury or falsified evidence[.]" We agree with the Court of Appeals that the assertion in the agreed judgment that Mullins was the child's primary caregiver and primary financial provider constituted both falsified evidence and fraud affecting the proceedings warranting relief from the judgment.

We note that the fraud upon which we base our ruling was not Picklesimer's claim that Mullins fraudulently led her to believe that Mullins intended to maintain a relationship with her. Rather, it was the false claim by both parties that Mullins was the de facto custodian. We would add that an agreement regarding parental rights cannot be conditioned upon the couple staying together and living in the same household. Such an agreement is about the parties' relationship with the child, and not the parties' relationship with each oth-

er. And the chance that the relationship with the nonparent will not continue does not diminish the strong parental bond that has been allowed to develop between the child and the nonparent.

■ Mullins also maintains that Picklesimer is not entitled to relief under CR 60.02 because she was a party to the fraud and thus had unclean hands. Under the "unclean hands doctrine," a party is precluded from judicial relief if that party "engaged in fraudulent, illegal, or unconscionable conduct" in connection "with the matter in litigation." *Suter v. Mazyck,* 226 S.W.3d 837, 843 (Ky.App.2007). "In a long and unbroken line of cases this court has refused relief to one, who has created by his fraudulent acts the situation from which he asks to be extricated." *Asher v. Asher,* 278 Ky. 802, 129 S.W.2d 552, 553 (1939). A trial courts decision to invoke the equitable defense of the unclean hands doctrine rests within its sound discretion. *See Petroleum Exploration v. Pub. Serv. Comm'n of Kentucky,* 304 U.S. 209, 218, 58 S.Ct. 834, 82 L.Ed. 1294 (1938). The doctrine will not be applied to all misconduct, as when "the plaintiff has engaged in conduct less offensive than that of the defendant." *Suter,* 226 S.W.3d at 843.

While the evidence established that Picklesimer signed the agreement voluntarily and clearly intended to confer custody rights on Mullins, it was Mullins' idea to have the agreed judgment drawn up by her attorney, and Picklesimer signed it without the benefit of her own counsel. Moreover, because the agreed judgment pertained to child custody, the equity of the parties was subordinate to the welfare of the child, and the judgment could not be permitted to stand if based on fraud or falsified evidence.

■ We likewise reject Mullins' contention that Picklesimer's failure to file an appeal from the agreed judgment barred

relief under CR 60.02. Although CR 60.02 is not a substitute for an untimely filed appeal, *see United Bonding Ins. Co. v. Commonwealth*, 461 S.W.2d 535, 536 (Ky. 1970), there is no requirement in CR 60.02 that an appeal be filed from the judgment. *See Urban Renewal & Community Dev. Agency v. Goodwin*, 514 S.W.2d 190, 191 (Ky.1974) (stating that a motion under CR 60.02 is not an appeal). Accordingly, the trial court did not abuse its discretion in setting aside the agreed judgment in the instant case.

### WAIVER

Mullins argues that the Court of Appeals erred in reversing the trial court's finding that Picklesimer waived her superior right to custody. She maintains that the Court of Appeals substituted its findings for the trial court's and misinterpreted the law relating to waiver.

Parents of a child have a fundamental, basic, and constitutional right to raise, care for, and control their own children. *Davis v. Collinsworth*, 771 S.W.2d 329, 330 (Ky.1989). When a non-parent does not meet the statutory standard of de facto custodian in KRS 403.270, the non-parent pursuing custody must prove either of the following two exceptions to a parent's superior right or entitlement to custody: (1) that the parent is shown by clear and convincing evidence to be an unfit custodian,[3] or (2) that the parent has waived his or her superior right to custody by clear and convincing evidence. *Moore*, 110 S.W.3d at 359. Contrary to Picklesimer's position, the concept of waiver of custodial rights was not superseded by KRS 403.270(1).[4] As the Court of Appeals stated in *Boone v. Ballinger*,

[I]t is apparent that the concept of waiver remains alive and well in a custody dispute between a non-parent and a parent in situations where the non-parent cannot qualify as a de facto custodian yet the parent's conduct warrants a finding of waiver, allowing the non-parent to then be considered for custody.

228 S.W.3d 1, 10 (Ky.App.2007).

Because Mullins could not qualify as the child's de facto custodian, as discussed above, the only way Mullins could establish custody rights to Zachary is if Picklesimer waived her superior custody rights.

"The common definition of a legal waiver is that it is a voluntary and intentional surrender or relinquishment of a known right, or an election to forego an advantage which the party at his option might have demanded or insisted upon." *Greathouse v. Shreve*, 891 S.W.2d 387, 390 (Ky.1995) (quoting *Barker v. Stearns Coal & Lumber Co.*, 291 Ky. 184, 163 S.W.2d 466, 470 (1942)). "Because this is a right with both constitutional and statutory underpinnings, proof of waiver must be clear and convincing. As such, while no formal or written waiver is required, statements and supporting circumstances must be equivalent to an express waiver to meet the burden of proof." *Vinson v. Sorrell*, 136 S.W.3d 465, 469 (Ky.2004) (quoting *Greathouse*, 891 S.W.2d at 390–91).

The trial court found that Picklesimer waived her superior right to custody "by acknowledging, on a continuous basis, that [Mullins] is a parent of the child, by permitting extensive visitation and time sharing with [Mullins], and by co-parenting the child along with [Mullins] from the child's birth until the separation of the parties." The trial court specifically found that

---

**3.** Not an issue in this case.

**4.** KRS 403.270(1) provides for de facto custodian status and sets out the requirements to qualify as a de facto custodian.

"[u]nlike a De Facto Custodian, waiver of the parent's superior right to custody is not required to be exercised at the exclusion of the natural parent." Relying on *Vinson v. Sorrell*, 136 S.W.3d 465, the Court of Appeals reversed the trial court, adjudging that there can be no waiver of one's custody right unless the child is separated from the natural parent while in the custody of the nonparent. Hence, the Court of Appeals held that because Zachary had always been in Picklesimer's care, Picklesimer could not have waived her superior right to custody.

In *Vinson*, the child had been in the custody of the grandparents for a year (due to the mother's drug problem), and had been away from the father for almost five years. *Id.* at 466. This Court considered the following factors in determining whether the father had waived his custody rights:

> length of time the child has been away from the parent, circumstances of separation, age of the child when care was assumed by the non-parent, time elapsed before the parent sought to claim the child, and frequency and nature of contact, if any, between the parent and the child during the non-parent's custody.

*Id.* at 470 (citing *Shifflet v. Shifflet*, 891 S.W.2d 392, 397 (Ky.1995) (Spain, J., concurring)). The Court of Appeals read the factors in *Vinson* to be exhaustive and as requiring separation of the child from the natural parent in all cases where waiver is alleged. Because of the complexity and uniqueness of child custody cases, we do not view the factors considered by this Court in *Vinson* to be exhaustive. While the factors in *Vinson* serve as a helpful guide in evaluating cases where the natural parent has surrendered full possession of the child to a nonparent, we believe these cases should be viewed on a case-by-case basis and that no specific set of factors must be present in order to find there has been a waiver.

■ Moreover, we adjudge that there can be a waiver of some part of custody rights demonstrating an intent to co-parent a child with a nonparent. We see no reason why the law of waiver of custody rights should apply only to the full surrender of the child to the nonparent, to the exclusion of a waiver of some part of the superior parental right, which would essentially give the child another parent in addition to the natural parent. In this case, Picklesimer waived her superior right to sole custody of the child in favor of a joint custody arrangement with Mullins. In joint custody, each parent has full legal custody of the child, but they must share decision-making and physical possession of the child. *See Pennington v. Marcum*, 266 S.W.3d 759, 764 (Ky.2008) and *Frances v. Frances*, 266 S.W.3d 754 (Ky.2008). What Picklesimer waived in this case was her right to be the sole decision-maker regarding her child and the right to sole physical possession of the child. This is an absolute waiver of part of her superior custody rights as the natural parent of the child.

■ The recognition of the applicability of the doctrine of waiver in a child custody situation is legally justified as well as necessary "in order to prevent the harm that inevitably results from the destruction of the bond that develops" between the child and the nonparent who has raised the child as his or her own. *Boone*, 228 S.W.3d at 10. The bond between a child and a co-parenting partner who is looked upon as another parent by the child cannot be said to be any less than the bond that develops between the child and a nonparent to whom the parent has relinquished full custody.

We find the case of *Heatzig v. MacLean,* 191 N.C.App. 451, 664 S.E.2d 347 (2008), which involved a child custody dispute between a natural parent and her former same-sex domestic partner over children conceived through artificial insemination, helpful in our analysis. In *Heatzig,* the North Carolina Court of Appeals couched its analysis in terms of whether the natural parent had acted in a manner inconsistent with her constitutionally protected status as a natural parent. *Id.* at 350–51. The Court noted that the focus should be on "whether the legal parent has voluntarily chosen to create a family unit and to cede to the third party a sufficiently significant amount of parental responsibility and decision-making authority to create a parent-like relation ship with his or her child." *Id.* at 354 (quoting *Estroff v. Chatterjee,* 190 N.C.App. 61, 660 S.E.2d 73, 78 (2008)). The *Heatzig* Court cited the following factors considered by the court in a similar case:

> (1) both plaintiff and defendant jointly decided to create a family unit; (2) defendant intentionally identified plaintiff as parent; (3) the sperm donor was selected based upon physical characteristics similar to those of plaintiff; (4) the surname of plaintiff was used as one of the child's names; (5) plaintiff participated in the pregnancy and the birth of the child; (6) there was a baptism ceremony where both plaintiff and defendant were identified as parents; (7) plaintiff was identified as a parent on school forms; (8) they functioned together as a family unit for four years; (9) after the relationship between plaintiff and defendant ended, the defendant allowed plaintiff the functional equivalent of custody for three years; (10) defendant encouraged, fostered, and facilitated an emotional and psychological bond between plaintiff and the child; (11) plaintiff provided care and financial support for the child; (12) the child considered plaintiff to be a parent; (13) plaintiff and defendant shared decision-making authority with respect to the child; (14) plaintiff was a medical power of attorney for the child; (15) the parties voluntarily entered into a parenting agreement; and (16) defendant intended to create between plaintiff and the child a permanent parent-like relationship.

*Heatzig,* 664 S.E.2d at 353–54 (citing *Mason v. Dwinnell,* 190 N.C.App. 209, 660 S.E.2d 58, 67 (2008)).

In the case at hand, a myriad of the above factors are present. The evidence established that Picklesimer and Mullins decided jointly to start a family, and the sperm donor was selected based on Mullins' characteristics. The child was given a hyphenated surname combining both parties' last names, and that name was listed on his birth certificate. Mullins was involved in the pregnancy, was there for the delivery and cared for Zachary during the period he was in the neonatal unit. Mullins, Picklesimer and Zachary functioned as a family unit for nearly a year, after which time the parties shared custody of Zachary for another five months. Zachary referred to Mullins as "momma," and it was undisputed that Picklesimer encouraged, fostered, and facilitated an emotional and psychological bond between Mullins and the child. Picklesimer admitted in her testimony that Zachary looked to both her and Mullins as his parents. There was evidence that Mullins provided for the care and financial support of Zachary (along with Picklesimer) when she was with Picklesimer and thereafter when they shared custody.

Finally, there was the parties' attempt to enter into a formal written agreement bestowing custody status on Mullins. Picklesimer argues that because the agreement was declared invalid due to Mullins

not having de facto custody status, it cannot the considered by the court as evidence of waiver. We disagree. Even though the agreement was properly found to be invalid, we nevertheless believe it was relevant to show Picklesimer's intent to confer parental rights to Zachary on Mullins.

A trial court's findings of fact in a domestic matter can only be set aside by a reviewing court if those findings are clearly erroneous. *Reichle v. Reichle,* 719 S.W.2d 442 (Ky.1986); CR 52.01. To determine whether findings are clearly erroneous, reviewing courts must focus on whether those findings are supported by substantial evidence. *Moore,* 110 S.W.3d at 354. From our review of the case, there was substantial clear and convincing evidence to support the trial court's finding that Picklesimer waived her superior custody rights to Zachary for the purpose of co-parenting the child with Mullins as joint custodians. Thus, we reverse the Court of Appeals on the waiver issue.

For the reasons stated above, the opinion of the Court of the Appeals is affirmed in part and reversed in part, and the judgment of the Garrard Circuit Court is reinstated.

All sitting. ABRAMSON, NOBLE, and VENTERS, JJ., concur.

CUNNINGHAM, J., concurs in part and dissents in part by separate opinion, in which MINTON, C.J., and SCOTT, J., join.

SCOTT, J., concurs in part and dissents in part by separate opinion.

CUNNINGHAM, J., concurring in part and dissenting in part.

Believing that the majority is writing with a wide legislative brush, sweeping away the precedents of this Court, I respectfully dissent as to the majority opinion concerning partial waiver.

KRS 405.020 and KRS 403.270, our custody statutes, provide standing in child custody claims only for parents and de facto custodians. Under the statutory scheme passed by our legislature, Appellant has neither standing nor the right to make a custody claim in this case. Neither does she have a claim under the long standing judicially imposed principle of waiver. The majority in this case in effect breaks out a totally new concept of a partial waiver to arrive at a result-driven decision.

The judicial principle of waiver, as applied to child custody, first saw the light of day in *Van Wey v. Van Wey,* 656 S.W.2d 731 (Ky.1983). However, this principle was first conceived as far back as sixty years ago in *Rose v. Ledford,* 306 Ky. 662, 208 S.W.2d 957 (1948). In these embryonic cases, right up to today, *surrender* of custody and separation were the critical lynchpins of the waiver concept. I submit that this is because the Court recognized that there was no statutory basis for such a theory, and it had to be construed tightly to protect the rights and interests of the natural parents.

We continued to speak in this vein in *Greathouse v. Shreve,* 891 S.W.2d 387 (Ky. 1995). The *Greathouse* majority stated that an intentional or voluntary relinquishment of a known right to custody occurs "where the party seeking custody has *surrendered* the care and custody of the child to another, *particularly a grandparent,* and has acquiesced in the child's remaining there for an extended period of time." *Id.* at 389 (emphasis added). The waiver as to non-parent claims to custody outside the statutory authority was strictly confined to one of the parents surrendering and relinquishing care and custody of the child— clearly not the case here. The series of

cases applying this principle have dealt only with grandparents, biological parents, or adoptive parents.

A brief review of these cases will clearly show how the majority today unhinges all precedents on this issue. In doing so, it severs the legal standing of parenthood from the safe mooring of the law.

In *Shifflet v. Shifflet*, 891 S.W.2d 392 (Ky.1995) (mother v. paternal grandmother), rendered at the same time as *Greathouse*, Justice Leibson warns: "The parent's superior right of custody is not lost to a non-parent, including a grandparent, simply because a child is left in the care of the non-parent for a considerable length of time." *Id.* at 394. In addition, because a parent's superior right of custody has both constitutional and statutory underpinnings, proof of waiver must be clear and convincing. *Id.*

In *Moore v. Asente*, 110 S.W.3d 336, 358 (Ky.2003) (birth parents v. adoptive parents), this Court stated:

> Kentucky's appellate courts have recognized not only that "parents of a child have a statutorily granted superior right to its care and custody," but also "that parents have fundamental, basic and constitutionally protected rights to raise their own children." And, because we would necessarily abrogate those rights if we were to resolve custody disputes on a "best interest of the child" standard after allowing the nonparent to obtain standing by mere possession of the child, we hold that "physical custody" for the purposes of establishing standing requires more than "actual possession and control of a child" at the time a custody action is commenced—i.e., a showing "that the parent *has somehow voluntarily and indefinitely relinquished custody of the child.*" (Emphasis added and internal citations omitted.)

In *Vinson v. Sorrell*, 136 S.W.3d 465, 469 (Ky.2004) (maternal grandparents v. father), we stated: "Without a finding that the parent is unfit or without clear and convincing evidence of a knowing and voluntary surrender of parental rights, a parent is entitled to custody." This Court looked at five key factors in making that determination. After doing so, this Court found that "[c]ase law clearly demonstrates that allowing [child] to live with her grandparents and [father's] sporadic participation in [child's] upbringing does not constitute express waiver." *Id.*

The *Vinson* factors were followed as late as three years ago by the Kentucky Court of Appeals in *Boone v. Ballinger*, 228 S.W.3d 1 (Ky.App.2007), a case dealing with a custody fight between a biological father and the "married father." Our distinguished sister, Justice Abramson, writing then for that court, found "all of these factors invariably present" in that case. *Id.* at 11.

What are these *Vinson* factors?

They all assume separation of the child from the natural parent and are consistent with the line of Kentucky cases which subscribe to the notion of separation.

These factors are: (1) the length of time the child has been away from the parent; (2) circumstances of separation; (3) age of the child when care was assumed by the non-parent; (4) time elapsed before the parent sought to claim the child; and (5) frequency and nature of contact, if any, between the parent and the child during the non-parents custody. *Vinson*, 136 S.W.3d at 470.

It is beyond dispute that no separation is present in this case; that the child has not been away from the parent; that care was never exclusively assumed by a non-parent; and that contact has remained uninterrupted. In other words, none of

the *Vinson* factors are present. The majority today totally casts aside these well-reasoned and entrenched considerations without as much as a wave of the hand.

By not requiring separation from parent as a requirement of waiver, the majority introduces a new principle in custody cases which amounts to a partial waiver. This judicial engineering undermines the statutory protection of the parent and opens the door wide for all third parties who can show shared participation in child rearing. This new found rule of law will—in an age of working parents and shared nurturing—equally fit as many grandparents, uncles, aunts, neighbors, and even babysitters, as it does Appellant and others who may "co-parent" a child. We cannot, by judicial edict, just open wide the door and wave everyone in who wishes to parent a child.

Lastly, the majority ruling here today edges us precariously close to running afoul of the U.S. Supreme Court case of *Troxel v. Granville,* 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), and our own Court of Appeals decision in *Scott v. Scott,* 80 S.W.3d 447 (Ky.App.2002), following that lead. "Very simply," said the Kentucky Court in quoting from *Troxel,* "the Due Process clause does not permit a State to infringe on the fundamental right of parents to make child rearing decisions simply because a state judge believes a 'better' decision could be made." *Id.* at 450. Those cases boldly restate that the right of a parent to his or her child is perhaps the most basic of all human rights. Our legislature has dutifully circumscribed those limited exceptions to these rights.

If there is one thing that the children of our Commonwealth need today it is stability.

This is a destabilizing decision.

We, in the first part of the 21st century, find ourselves in a torrent of fast moving waters of change in American domestic life. We are constantly confronted, as here, with domestic arrangements that the writers of our family and child custody laws never imagined thirty years ago. How to deal with these changes are political concerns. We should not, in order to accommodate unique and peculiar situations, impose our own whim upon a situation that is a legislative matter.

MINTON, C.J., and SCOTT, J., join this opinion.

SCOTT, J., concurring in part and dissenting in part.

I am compelled by the logic of "parenthood" and precedent to join Justice Cunningham's well-reasoned dissent. The new of theory of "waiver" fashioned by the majorities' opinion—now "unhinged" from the former requirement of the child's significant physical separation from the parent—will ultimately enable step-parents to contest for custody of their step-children, even in short term marriages.