RENDERED:  MAY 14, 2021; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2018-CA-0075-MR

JAN M. CURRIN
AND TIM THOMAS CURRIN                                    APPELLANTS


ON REMAND FROM THE KENTUCKY SUPREME COURT
(FILE NO. 2019-SC-0279-DG)

APPEAL FROM BOONE CIRCUIT COURT
v.       HONORABLE JAMES R. SCHRAND II, JUDGE
ACTION NO. 12-CI-02278



ESTATE OF JOHN C. BENTON, JR.
BY MARY R. MARCUM AS EXECUTOR                           APPELLEE


OPINION
AFFIRMING

** ** ** ** **

BEFORE:  CLAYTON, CHIEF JUDGE; JONES AND L. THOMPSON,
JUDGES.

JONES, JUDGE:  This matter is before us on remand from the Supreme Court of

Kentucky.  *Estate of Benton by Marcum v. Currin*, 615 S.W.3d 34 (Ky. 2021).

Because our prior holding was dispositive, we did not address the other issues

presented by Appellants.[1]  After holding that we erred in reversing on the basis of an improper revival, the Supreme Court remanded this case to our Court "for consideration of the unaddressed issues raised by the parties in their appeal." *Id.* at 39.  In accordance with the Supreme Court's directive, we have reviewed and considered the additional arguments presented by Appellants.  Finding none of those issues warrants reversal, we affirm the Boone Circuit Court.

## I. BACKGROUND

At the heart of this dispute is a house located in Boone County and John C. Benton, Jr.'s subsequent transfer of the house to Jan and Tim Currin, the Appellants.

John owned and operated the Benton Family Farm, located in Walton, Kentucky (the "Farm").  John and his wife, Rose Mary, built the house at issue (the "House") on the Farm in 2006.  John was close friends with Jan's father and had

---

[1] We previously held that Appellee Mary R. Marcum, as executrix of John Benton, Jr.'s estate ("the Estate"), failed to comply with the requirements for revival because the Estate's motion to substitute under Kentucky Rule of Civil Procedure ("CR") 25.01, alone, did not constitute revival.  Following rendition of our opinion, the Estate petitioned the Supreme Court of Kentucky for discretionary review.  The Supreme Court granted review and subsequently reversed our prior opinion in this matter.  Specifically, the Supreme Court held that "KRS [Kentucky Revised Statute] 395.278 is a statute of limitation, and that a motion for substitution properly filed with the court in accordance with CR 25.01(1) within the one-year allotted by the legislature constitutes revival." *Estate of Benton*, 615 S.W.3d at 39.  In the course of doing so, the Supreme Court overruled the long line of cases this Court relied on in our first opinion. *Id.* ("To the extent that the following Court of Appeals decisions mandate a two-step process of a motion to revive and a motion to substitute, they are overruled: *Lococo v. Ky. Horse Racing Comm'n*, 483 S.W.3d 848 (Ky. App. 2016); *Koenig v. Pub. Prot. Cabinet*, 474 S.W.3d 926 (Ky. App. 2015); *Frank v. Estate of Enderle*, 253 S.W.3d 570 (Ky. App. 2008); *Snyder v. Snyder*, 769 S.W.2d 70 (Ky. App. 1989).").

-2-

known Jan since she was born. As a result of her father's friendship with John, Jan frequently visited the Farm during her childhood. As Jan grew older and began her adult life, her contact with John and her visits to the Farm decreased; however, she and John continued to see each other at least once a year when Jan would bring her children to the Farm to pick pumpkins. The nature of John and Jan's relationship changed in 2007, following Jan's brother's unexpected death. Shortly after Jan's brother's funeral, which John attended, John reached out to Jan and requested that she come to the Farm to visit. When Jan did so, John told her that he wanted to give her five acres of the Farm. Shortly thereafter, Jan, Tim, and their children visited the Farm together, and John staked off the five acres that he intended to give to Jan. From that point forward, Jan and Tim began traveling to the Farm on a regular basis, both to socialize with John and his family and to volunteer their time to operations on the Farm.[2]

Rose Mary committed suicide in the House in April of 2010. Following this tragedy, John had difficulty residing in the House and expressed his desire to give it to the Currins and construct a new residence on the Farm for himself. In September of 2010, John had his attorney draft a quitclaim deed conveying the House to the Currins. That deed indicated that John was conveying

---

[2] The parties dispute how often Jan and Tim visited the Farm during this period and how much work they did when they were there; however, it is undisputed that Jan and Tim began visiting the Farm at least semi-regularly in 2007 and that they did do work while there.

the House to the Currins "for the consideration of $1.00 and other consideration," and that the consideration reflected therein was the "full consideration paid for the property."

The parties agreed that John would continue to reside in the House until construction of his new residence was completed. John moved into his new residence in November of 2011, at which point the Currins were given the keys to the House. The Currins, however, did not move into the House at that time and, in fact, have not spent the night there since receiving the keys. While the parties take different positions as to what exactly transpired, it is undisputed that the Currins drastically decreased any communication with John and members of his family shortly after John vacated the House and gave the Currins the keys.

In November of 2012, John filed suit against the Currins alleging failure of consideration and fraud in the inducement. In his complaint, John alleged that after Jan and Tim began volunteering on the Farm in 2007, they had repeatedly requested that they be given a stake in the Farm in exchange for their work. John alleged that he had attempted to deed the Currins a five-acre tract of the Farm in 2009 to fulfill Jan's request but had been blocked from doing so by the Kenton County planning and zoning committee.[3] John contended that, following Rose Mary's death, Jan had persisted in her requests that she be given a portion of

---

[3] The county line for Boone and Kenton Counties cuts through the Farm.

the Farm. Because the Currins promised him that they would help maintain the Farm and assist in his agro-tourism business, John agreed to give them the House. John alleged that the Currins had agreed that they would do everything possible to ensure that the Farm stayed in one piece and was not developed. The Currins had not fulfilled this promise, having instead "dropped out" of his life as soon as he conveyed the House to them.

The Currins responded to the complaint by filing a motion for summary judgment, which was denied. On February 11, 2013, the Currins filed an answer, counterclaim, and third-party complaint. The Currins brought counterclaims of fraudulent acquisition of services, unjust enrichment, promissory estoppel, and fraudulent misrepresentation against John. In support of those claims, the Currins contended that John had induced them to work without pay on the Farm by promising to convey a five-acre tract of the Farm to them; a promise they had only recently discovered John was unable to fulfill. The Currins asserted that they would have never volunteered on the Farm if they had known that John was not going to give them the five-acre tract he had promised. The Currins alleged that they had suffered financially as a result of volunteering on the Farm in that they had used their own vehicles to commute to the Farm from Cincinnati, Ohio, and had worked fewer hours at their full-time jobs in order to be able to volunteer. By their third-party complaint, the Currins added Benton Family Farms,

Inc. and John C. Benton as the Trustee of the John C. and Rose M. Benton Trust as third-party defendants.[4] The Currins claimed that Benton Family Farms, Inc. was not authorized to perform business in Kentucky, as it operated under the name "Benton Family Farm" but had not filed a certificate of assumed name pursuant to KRS 365.015. They also brought claims of unjust enrichment and fraud against Benton Family Farms, Inc. and the Trust alleging that those entities had fraudulently misrepresented to Jan that she had an ownership interest in the Farm to induce her to perform work without pay.[5]

The Currins filed a renewed motion for summary judgment on May 26, 2017. In the accompanying memorandum, the Currins contended that it was undisputed that John had conveyed the House to the Currins by a quitclaim deed, that John's attorney had drafted that deed, and that the stated consideration in the deed was $1.00 and other consideration. The Currins contended that the trial court could not consider parol evidence of other consideration because the deed was not ambiguous on its face. They noted that two clauses in the deed stated that the full

---

[4] Based on the record, it appears that John had transferred title to the Farm to the Trust in 2001. John, Rose, and their children were trustees of the Trust. Benton Family Farm, Inc. was incorporated as a non-profit corporation in 2011.

[5] John passed away on May 31, 2014. On January 6, 2015, his counsel filed a motion under CR 25.01 to substitute the Estate of John C. Benton, Jr. and Mary R. Marcum, as Executrix of the Estate of John C. Benton, Jr. (collectively referred to as the "Estate") as plaintiffs in the action. On January 7, 2015, the Currins filed a motion to revive their counterclaim pursuant to KRS 395.278. Both motions were granted by orders entered January 14, 2015.

consideration was reflected therein and that nothing in the deed mentioned an oral contract. Even if the trial court did conclude the deed was ambiguous, the Currins contended that summary judgment was still appropriate as John had admitted numerous times in his deposition testimony that he intended to give the House to the Currins as a gift. Further, the Currins contended that the alleged oral agreement between them and John could not be enforced as it was barred by the statute of frauds[6] and was illusory. Finally, the Currins contended that John had prevented them from fulfilling the alleged promise when he had his daughter, Mary Marcum, inform the Currins that their services were no longer needed on the Farm in the spring of 2012. The Currins filed an addendum to their motion for summary judgment on June 5, 2017, in which they contended that John's fraud claim must fail because it was based on a promise to perform in the future, not a present or pre-existing fact. Following the Estate's response and the Currins' reply, the trial court denied the motion for summary judgment on August 11, 2017, concluding that material issues of fact remained.

A three-day jury trial took place over September 18, 19, and 20, 2017. Much of the testimony given concerned the amount of time the Currins spent at the Farm between 2007 and 2011 and the amount of work they performed while there. The Estate additionally offered testimony from numerous witnesses casting doubt

---

[6] KRS 371.010.

on the close familial relationship the Currins alleged that they had with John and his family. As related to the alleged oral agreement and the transfer of the House, Jan and Tim both gave testimony denying that they had made any agreement with John in connection with him deeding them the House. Jan testified that, following Rose Mary's death, John had insisted that the Currins have the House. Jan testified that at first she had ignored John when he mentioned giving them the House, but she had eventually acquiesced. Jan believed that John wanted to give them the House as a gift so that they would not have to commute back and forth to the Farm. While Jan acknowledged that she had told John and his daughter, Mary Marcum, that she would continue working on the Farm, she testified that doing so had not been a stipulation to her receiving the deed to the House. Jan testified that the only reason that she had not continued working on the Farm was because her mother, who has dementia, had declined in health and had moved into her and Tim's home in 2011. A portion of Tim's deposition testimony was read to the jury. Therein, Tim testified that John had given the Currins the House because he wanted them to be a part of the Farm, wanted their commute to be less painful, and considered them family. Tim testified that he had felt like he was a part of the Farm and felt like it was his obligation and duty to help the Farm succeed. However, Tim testified that in April of 2012, he had received a text message from Mary telling him that his and Jan's services were no longer needed on the Farm.

John's videotaped deposition testimony was played for the jury. He testified that he had transferred the Farm to the Currins because they told him that they wanted to see the Farm continue on in the future. John testified that Tim had promised that he would give 110% to help keep the Farm going but had not fulfilled this promise. John testified that he had told the attorney who drafted the deed for him that he was giving the House to the Currins as a "gift" in exchange for their helping him on the Farm. He testified that it was his intent to give the House to the Currins as a gift. John stated that the oral promise was that the Currins would give 110% to the Farm but that he did not know exactly what that meant. John testified that there was no set timeframe for the alleged oral agreement but that it could not have been fulfilled within one year. He believed that Jan and Tim had promised to take care of the Farm for the rest of their lives. Mary testified that John had told her that he wanted to give the House to the Currins. Mary talked to Jan about this, and Jan told her that if she and Tim were to continue working on the Farm, they needed to know that they had a stake in it. Mary testified that Jan told her that she wanted the House so that she did not have to drive back and forth so much. Mary testified that she had initially believed Jan when Jan said that she would help to preserve the Farm in the future. However, Mary testified that after receiving the keys to the House, the Currins had stopped coming to the Farm and stopped responding to her phone calls, texts, and letters.

On September 20, 2017, the jury returned a verdict finding that: John had not intended to deed the House to the Currins as a gift; John had entered into an agreement with the Currins, which the Currins had not fulfilled; and the Currins had not made a material misrepresentation to John. On October 31, 2017, the trial court entered an order and judgment in accordance with the jury's verdict. As the jury found that there had been an agreement between the Currins and John, but that the Currins had not fulfilled that agreement, the trial court concluded there was a failure of consideration for the deed and canceled it.

On November 2, 2017, the Currins filed a motion for judgment notwithstanding the verdict; a motion to alter, amend, or vacate the judgment; and a motion to rehabilitate the verdict by operation of law. Therein, the Currins contended that because a jury had concluded that they had not committed fraud, the doctrine of unclean hands, the statute of frauds, the doctrine of merger, and estoppel by deed barred the Estate from prevailing on its claims against them as a matter of law. Further, the Currins argued that the testimony heard at trial established that any oral promise they had made to John was illusory and unenforceable. They noted that, while John's testimony indicated that the Currins had promised to give him "110%" to keep the Farm going, neither he nor any other witness had been able to explain what exactly that promise meant, and the jury had not made any findings as to what the alleged agreement required. Finally, the

Currins argued that John's testimony had been so contradictory that it could not possibly constitute clear and convincing evidence on which the jury could base a verdict.

Following the Estate's response and the Currins' reply, the trial court entered an order on January 2, 2018, denying the Currins' motions. The trial court concluded that applying the doctrine of unclean hands would be inappropriate, as it could not find that John had intentionally failed to comport with the requirements of KRS 382.135, had perpetrated fraud, or had given a false statement as to the full consideration for the House. As to the Currins' contention that the statute of frauds should have barred the Estate's claim, the trial court noted that KRS 371.010 explicitly provides that consideration need not be in writing, but can be proven or disproven through parol evidence. Additionally, the trial court concluded that estoppel by deed and the doctrine of merger were inapplicable, as the deed had stated that "other consideration," in addition to the $1, was part of the deed. The trial court disagreed with the Currins' contention that any agreement between them and John was illusory, as evidence had been presented indicating that the Currins agreed they would take care of the Farm if they received the House. The trial court likened the agreement to an agreement to provide future care for a person, which it noted courts had routinely upheld as sufficient to support a deed. Finally, the trial court concluded that it was appropriate to determine whether true consideration

was different than consideration expressed in a deed even without an allegation of fraud or mistake.

This appeal followed.

## II. ANALYSIS

The Currins present the following assignments of error for our review: (1) the alleged oral agreement between John and the Currins is unenforceable per KRS 372.030(7) because it could not and/or was not intended to be performed within one year; (2) the Estate's request for equitable relief should have been barred by the doctrine of unclean hands; (3) estoppel by deed should have been used by the trial court to prevent the Estate from arguing that the transfer was for additional consideration not stated in the deed; (4) the trial court should have applied the doctrine of merger and refused to consider/allow evidence of the alleged oral promise since it is not contained in the deed itself; (5) the oral agreement was an illusory contract and should have been so interpreted by the trial court; and (6) John's deposition testimony was so contradictory that it did not rise to the level of clear and convincing evidence, and the trial court should have granted the Currins' motion for a judgment notwithstanding the verdict. We consider each argument below.

## A. *Statute of Frauds*

The Currins argue that the trial court erred in allowing the Estate's claim to come before a jury because KRS 371.010 provides that "[n]o action shall be brought to charge a person . . . (7) [u]pon any agreement that is not to be performed within one year from the making thereof . . . unless the promise, contract, agreement, representation, assurance, or ratification, or some memorandum or note thereof, be in writing and signed by the party to be charged therewith, or by his authorized agent." *Id.* As noted by the Estate, however, the statute goes on to state that "[i]t shall not be necessary to express the consideration in the writing, but it may be proved when necessary or disproved by parol or other evidence." *Id.* Based on this language, the trial court concluded that "parol evidence to show the additional consideration alleged by [the Estate] i.e. that [the Currins] would give 110% to keeping the farm going, was appropriate."

The deed between John and the Currins was in writing. The issue in this case involves the exact nature of the consideration for John's conveyance to the Currins. The statute of frauds does not require the exact nature of the consideration to be expressed in the deed. The consideration may be proved by parol evidence. *See McIntosh v. Turner*, 239 Ky. 495, 39 S.W.2d 966, 967 (1931) ("If Burns and wife did convey or contract to convey to appellant the property in question, and, as a part of the consideration for their so doing, appellant assumed

and agreed to pay Turner the balance due him, his promise and agreement does not come within the statute of frauds."); *Ingram v. Turner*, 301 S.W.2d 436, 437 (Ky. 1957) ("It is true that the deed did not recite this as consideration, but true consideration in a deed may be shown by parol evidence."). In sum, "[w]e think the court under the facts properly admitted the parol evidence . . . as a proper method of ascertaining the true consideration for the deed of conveyance." *C.C. Leonard Lumber Co. v. Reed*, 314 Ky. 703, 236 S.W.2d 961, 964 (1951).

### B. Unclean Hands

Next, the Currins argue that the trial court abused its discretion in ordering the deed rescinded under these circumstances based on the doctrine of unclean hands. The Currins note that KRS 382.135 requires a party to state the full and correct consideration for a deed under penalty of perjury. They contend that the evidence showed that John's failure to comply with KRS 382.135 was both intentional and fraudulent, and that this should prevent the Estate from benefiting from the equitable remedy of rescission for failure of consideration.

> Under the "unclean hands doctrine," a party is precluded from judicial relief if that party "engaged in fraudulent, illegal, or unconscionable conduct" in connection "with the matter in litigation." *Suter v. Mazyck*, 226 S.W.3d 837, 843 (Ky. App. 2007). "In a long and unbroken line of cases this court has refused relief to one, who has created by his fraudulent acts the situation from which he asks to be extricated." *Asher v. Asher*, 278 Ky. 802, 129 S.W.2d 552, 553 (1939). A trial court's decision to invoke the equitable defense of the unclean hands

-14-

doctrine rests within its sound discretion. *See Petroleum Exploration v. Pub. Serv. Comm'n of Kentucky*, 304 U.S. 209, 218, 58 S. Ct. 834, 82 L. Ed. 1294 (1938). The doctrine will not be applied to all misconduct, as when "the plaintiff has engaged in conduct less offensive than that of the defendant." *Suter*, 226 S.W.3d at 843.

*Mullins v. Picklesimer*, 317 S.W.3d 569, 577 (Ky. 2010).

The Currins' argument that John has unclean hands is predicated on John's alleged failure to comply with KRS 382.135. KRS 382.135 sets forth the consideration requirement for deeds:

(1) In addition to any other requirement imposed by law, a deed to real property shall contain the following: . . . (c) A statement of the full consideration; . . . (e) 1. In the case of a transfer other than by gift, or with nominal or no consideration a sworn, notarized certificate signed by the grantor . . . that the consideration reflected in the deed is the full consideration paid for the property; or . . . 2. In the case of a transfer either by gift or with nominal or no consideration, a sworn, notarized certificate signed by the grantor . . . stating that the transfer is by gift and setting forth the estimated fair cash value of the property. . . . (7) The receipt for record and recording of any instrument by the county clerk not in compliance with this section shall not prevent the record of filing of the instrument from becoming notice as otherwise provided by law, nor impair the admissibility of the record as evidence.

*Id.* KRS 382.990(8) provides that: "[a]ny person who willfully and fraudulently gives a false statement as to the full actual consideration of property or the full estimated value under KRS 382.135, shall be guilty of a Class D felony."

-15-

The trial court refused to apply the doctrine of unclean hands to bar the Estate from rescinding the deed, reasoning that John substantially complied with KRS 382.135 by listing the fair market value of the property as $150,000.00, an amount that was not disputed by the parties, and stating that the property was being exchanged for "$1.00 and other consideration." Given these recitations, the trial court determined that it did not believe the evidence showed that John "perpetuated a fraud or gave a false statement as to the full consideration of the property."

We cannot conclude the trial court abused its discretion in refusing to apply the doctrine of unclean hands. "[T]he purpose of [KRS 382.135] has always been to facilitate proper taxing of the conveyance." *Smith v. Vest*, 265 S.W.3d 246, 253 (Ky. App. 2007). This is why the statute requires parties who are exchanging the property as a gift or for some form of minimal or non-monetary compensation to include its fair market value in the deed. *Id.* John listed the fair market value of the property in the deed as $150,000.00. There has been no showing that John's estimation of the fair market value was purposefully deflated or inaccurate in any way.

## C. Estoppel by Deed & Merger Doctrine

The Currins argue that, as a matter of law, the trial court should not have permitted the Estate to rely on an oral promise that conflicted with the

consideration stated in the deed. The trial court rejected this argument on the basis that the deed stated "$1.00 and other consideration" and that parol evidence was employed so the jury could ascertain what was meant by "other consideration."

"An estoppel by deed 'precludes a party to the deed and also those in privity with him from asserting against the other party thereto and his privies any right or title in derogation of the deed or from denying the truth of any material fact asserted in it.'" *Hunts Branch Coal Co., Inc. v. Canada*, 599 S.W.2d 154, 156 (Ky. 1980) (quoting *Kentucky River Coal Corp. v. Jones*, 441 S.W.2d 409, 411 (Ky. 1969)). "[I]t cannot be invoked in an action or proceeding in which the form of the instrument is immaterial and the true nature of the transaction can be shown by parol." 31 C.J.S. *Estoppel and Waiver* § 9.

"The merger doctrine holds that all prior statements and agreements, both written and oral, are merged into the deed and the parties are bound by that instrument." *Borden v. Litchford*, 619 S.W.2d 715, 717 (Ky. App. 1981). "The exceptions to the merger doctrine are fraud, mistake, or contractual agreement clearly not intended to be merged into the deed." *Harrodsburg Indus. Warehousing, Inc. v. MIGS, LLC*, 182 S.W.3d 529, 532 (Ky. App. 2005).

The trial court properly rejected application of estoppel by deed and the merger doctrine. There was no question John transferred the property to the Currins by way of a deed. Likewise, the deed stated that the transfer was in

exchange for $1.00 and "other consideration." The Estate's evidence was not introduced to contradict or vary the terms of the deed; rather, the evidence was directed at what the parties meant by "other consideration." We conclude that the evidence was properly admitted for this purpose, and neither estoppel by deed nor the merger doctrine barred the Estate from relying on parol evidence to prove what the parties meant by "other consideration."

### D. Illusory Term or Agreement

The Currins next argue that the trial court should have determined that the parties' agreement was illusory and unenforceable as a matter of law. "'An illusory contract may be defined as an expression cloaked in promissory terms, but which, upon closer examination, reveals that the promisor has not committed himself in any manner. In other words, an illusory promise is a promise that is not a promise. The promise is an illusion.'" *Maze v. Board of Directors for Commonwealth Postsecondary Education Prepaid Tuition Tr. Fund*, 559 S.W.3d 354, 367 (Ky. 2018) (quoting *Harrington v. Harrington*, 365 N.W.2d 552, 555 (N.D. 1985)).

> Where an illusory promise is made, that is, a promise merely in form, but in actuality not promising anything, it cannot serve as consideration. Even if it were recognized by law, it would impose no obligation, since the promisor always has it within his power to keep his promise and yet escape performance of anything detrimental to himself or beneficial to the promissee. In such cases, the

> promisor may perform or not, solely on the condition of
> his whim, his promise will not serve as consideration.

*RAM Engineering & Const., Inc. v. University of Louisville*, 127 S.W.3d 579, 586 (Ky. 2003) (quoting 7 WILLISTON ON CONTRACTS, § 7:6, at 77-79, and § 7:7, at 88-89 (4th ed. 1992)).

In substance, the evidence showed that the parties agreed that John would deed the House to the Currins in exchange for the Currins' agreement to care for the Farm and to give 110% of themselves to keeping the Farm going. A long line of cases in Kentucky supports the enforceability of such agreements and sanctions rescission of the deed where the care and support agreed for was not provided. *See Alvey v. Alvey*, 30 Ky. L. Rptr. 234, 97 S.W. 1106, 1107 (1906) ("[I]n contracts of this character, where a party in consideration of a conveyance to him of land assumes to maintain and take care of the grantor, his failure to substantially perform his contract will authorize its rescission."); *Watson v. Gilliam*, 252 Ky. 762, 68 S.W.2d 399, 401 (1934) ("In view of the evidence . . . it clearly and satisfactorily shows that appellees failed to furnish and care for appellant . . . and they thereby failed to comply with the terms of the deed, . . . it follows that the chancellor erred in failing to cancel and set aside the deed."); *Wireman v. Wireman*, 259 Ky. 120, 81 S.W.2d 908, 910 (1935) ("Upon the whole case, we are satisfied that the appellant did not receive the care and support contracted for with his son, nor is he properly chargeable with having prevented

the son's performance of the contract, for which reason we are of the opinion that the appellant is entitled to have a rescission of his deed as for a failure of consideration."); *Bostic v. Bostic*, 264 S.W.2d 59, 60 (Ky. 1954) ("It is established beyond any question that an agreement for future support will constitute a valid consideration for the conveyance of real estate. It is equally well settled that a failure to substantially perform the agreement on the part of the grantee will authorize rescission of the contract.").

While the term "other consideration" was ambiguous, we do not believe it was so incapable of definition as to render it illusory. The jury heard the testimony of the parties regarding what the parties intended. In sum, the parties intended for the Currins to work at the Farm and to keep it going. The jury further heard that eventually the Currins stopped coming to the Farm and ceased their work. The jury was able to ascertain the obligations the agreement placed on the Currins and reach a reasonable conclusion based on a preponderance of the evidence that the Currins did not continue to work at the Farm and keep it going as they had promised John they would do.

### E.  Sufficiency of the Evidence

Lastly, the Currins argue that John's testimony was so equivocal in terms of the agreement that it cannot support the jury's verdict by clear and

convincing evidence. The trial court disagreed, "finding the jury heard sufficient testimony to render the verdict."

"The denial of a motion for a judgment notwithstanding the verdict should only be reversed on appeal when it is shown that the verdict was palpably or flagrantly against the evidence such that it indicates the jury reached the verdict as a result of passion or prejudice." *Peters v. Wooten*, 297 S.W.3d 55, 65 (Ky. App. 2009). While John's testimony with respect to whether the Farm was deeded to the Currins as a gift or in exchange for their labor was muddled at times, on the balance, the evidence as a whole plainly reflected that the Currins and John entered into an agreement that was predicated on the Currins continuing to work at the Farm and keep it going. John's occasional characterization of the transfer as a "gift" was not alone sufficient to compel a judgment in the Currins' favor, particularly in light of the other testimony of record that the Currins continuing to work on the Farm was envisioned by both parties at the outset of their agreement. Accordingly, we cannot conclude that the trial court abused its discretion in refusing to set aside the judgment on this basis.

### III. CONCLUSION

For the reasons set forth above, we affirm the Boone Circuit Court.

ALL CONCUR.

BRIEFS FOR APPELLANTS:

Charles E. Bullard
Mary G. Hayes
Ft. Mitchell, Kentucky

BRIEF FOR APPELLEE:

Marcus S. Carey
Erlanger, Kentucky