Carson PENTICUFF, Appellant

v.

Mark Dwayne MILLER and
Erin Marie Miller (Now
O'Reilly), Appellees

and

Mark Dwayne Miller, Appellant

v.

Erin Marie Miller (Now O'Reilly), and
Carson Penticuff, Appellees

NO. 2015-CA-001101-ME, NO.
2015-CA-001129-ME

Court of Appeals of Kentucky.

NOVEMBER 4, 2016; 10:00 A.M.

BRIEF FOR APPELLANT, MARK DWAYNE MILLER: Joseph E. Lambert, Mt. Vernon, Kentucky

BRIEF FOR APPELLANT, CARSON PENTICUFF: Jennifer S. Nicholson, London, Kentucky

BRIEF FOR APPELLEE, ERIN MARIE MILLER (now O'REILLY): Brittany N. Riley, London, Kentucky

BRIEF FOR APPELLEE, CARSON PENTICUFF: Jennifer S. Nicholson, London, Kentucky

BRIEF FOR APPELLEE, MARK DWAYNE MILLER: Joseph E. Lambert, Mt. Vernon, Kentucky

BEFORE: CLAYTON, JONES, AND NICKELL, JUDGES.

## OPINION

CLAYTON, JUDGE:

In these consolidated appeals, a young boy (hereinafter "Child") ostensibly has two fathers—Mark Dwayne Miller (hereinafter "Miller"), who was married to Child's mother when Child was born, and Carson Penticuff (hereinafter "Penticuff"), who is the natural father. During the pregnancy and after Child's birth, Child's mother, Erin Marie Miller, now O'Reilly (hereinafter "Mother"), misled Penticuff into believing Child was not his. Miller and Mother divorced shortly after Child was born. During Child's first few years, Miller held joint custody of Child with Mother, with Mother being the primary custodian.

Almost five years after Child was born, Mother contacted Penticuff via telephone and told Penticuff he was Child's father. Once the truth of Penticuff's fatherhood was revealed, DNA testing was conducted, which determined to a 99.99% probability that Penticuff was the father. Armed with this knowledge, Penticuff sought a paternity determination along with custody, support, and visitation. In response, Miller claimed Mother and Penticuff waived their superior custody rights. A hearing was held at which the following evidence was adduced.

Mother and Miller were married in 2007. Their relationship was rocky, and in October of 2007 Mother obtained a Domestic Violence Order ("DVO") against Miller. It also came to be known that Miller committed a third-degree rape of his 14-year-old cousin. As a result of the sexual offense, Miller went to prison in February of 2008.

During this tumultuous time, Penticuff and Mother, who worked together, had a sexual relationship in January and Febru-

ary of 2008. Shortly after the relationship ended between Penticuff and Mother, Penticuff learned that Mother was pregnant. Following Mother's first doctor's visit, Mother informed Penticuff the child was not his. A co-worker confirmed that she overheard Mother tell Penticuff that Penticuff was not Child's father. Mother then informed Miller's mother that she was going to be a grandmother, and Miller's mother accompanied Mother to the ultrasounds and Child's birth. Miller also was granted a furlough from prison to attend Child's birth.

Mother claimed she was scared of Miller due to the domestic violence. In spite of the fact that Mother held Miller out as Child's father, Mother eventually testified that she did not have sex with Miller between the issuance of the DVO in October, 2007, and Miller going to prison in February, 2008. Miller, on the other hand, claimed he violated the DVO and had sex with Mother multiple times a day in the days leading up to him going to prison. Miller claimed he did not know about Mother's relationship with Penticuff, and he never doubted he was Child's father.

Child was born on November 11, 2008 while Miller was still in prison and many months after Mother and Penticuff's relationship ended. Mother listed Miller as Child's father on the birth certificate. Mother took Child to visit Miller in prison until Miller was released in early 2009.

Mother and Miller's relationship would not last, however. Mother and Miller filed for divorce shortly after Miller was released from prison. Miller paid child support and visited with Child after Miller was released from prison. He and Mother shared joint custody of Child. Around the same time period in early 2009, Mother and Penticuff's relationship restarted, and Mother, Penticuff, and Child lived together for approximately six months before the relationship ended.

Years went by and Mother sought to move to California. Miller, who had joint custody of Child, blocked the move. Mother then telephoned Penticuff, in late 2013, and informed him that he was Child's father. Penticuff privately obtained a paternity test in December, 2013. The results showed a 99.99% probability that Penticuff is Child's father. Penticuff then sought to establish custody, support, and visitation with Child.

At the conclusion of the hearing, and after the trial judge who presided over the hearing recused himself, an order was entered finding and concluding that Penticuff was Child's natural father, but Penticuff had waived his superior right to custody of Child. It further concluded that Mother had not waived her superior right to custody, as she was afraid of Miller. Finally, the trial court concluded that Miller, who was neither a *de facto* custodian nor Child's biological father, did not step into Penticuff's shoes as father and thus had no legal claim to custody or visitation with Child.

The order concluded that Miller was "barred from custody or visitation with [Child] since [Mother] did not waive her superior custody rights and she does not want Mark Miller to have custody or visitation with [Child.]" It further allowed that Penticuff could "by motion schedule hearings to determine custody, visitation, and child support." Both Penticuff and Miller appeal. Their appeals have been consolidated to the same panel of this Court. We address their issues below.

## ANALYSIS

### APPEAL 2015-CA-001101-ME

Penticuff raises three issues in his appeal: (1) the trial court erred by finding Penticuff waived his superior rights of

Child's custody; (2) the trial court erroneously admitted a prior statement in violation of Kentucky Rules of Evidence (KRE) 613; and (3) Judge Vanover erroneously recused himself from the case.

### I. Did the trial court err by finding Penticuff waived his superior rights of Child's custody?

■ Penticuff first claims the trial court erred by finding he waived his superior rights of Child's custody. As the trial court initially found that Penticuff is Child's biological father, Penticuff "ha[s] a fundamental, basic, and constitutional right to raise, care for, and control [his] own child[ ]." *Mullins v. Picklesimer*, 317 S.W.3d 569, 578 (Ky. 2010) (citing *Davis v. Collinsworth*, 771 S.W.2d 329, 330 (Ky. 1989)). Mother, likewise, has the same fundamental, basic, and constitutional right to raise, care for, and control Child.

■ Though fundamental, basic, and constitutional, this right may be waived by a parent either being an unfit custodian, or by a non-parent presenting clear and convincing evidence demonstrating that the biological parent has waived his or her superior right to custody. *Vinson v. Sorrell*, 136 S.W.3d 465, 468 (Ky. 2004). *See also Mullins*, *supra*. There are no allegations that Penticuff is an unfit custodian, *Vinson*, 136 S.W.3d at 470–71; thus, the analysis turns on whether Miller presented clear and convincing evidence that Penticuff waived his superior right to custody.

■ Because a bond develops between a child and a nonparent who raises the child as his or her own, a parent through his or her actions can waive in whole or in part his or her superior right to custody. *Mullins*, 317 S.W.3d at 579. The waiver must be a "voluntary and intentional surrender or relinquishment of a known right or an election to forego an advantage which the party at his option

might have demanded or insisted upon." *Id.* at 578 (quoting *Greathouse v. Shreve*, 891 S.W.2d 387, 390 (Ky. 1995)). A written, formal waiver is not required; nonetheless, "statements and supporting circumstances must be equivalent to an express waiver to meet the burden of proof." *Id.* at 578 (quoting *Vinson*, 136 S.W.3d at 469).

■ Accordingly, a parent who knows a child is his or hers may demonstrate the voluntary and intentional nature of the waiver by: entering into a joint custody arrangement with the nonparent; intentionally identifying the nonparent as a parent; having the nonparent participate in the child's birth; identifying the nonparent as a parent on school forms; functioning as a family unit for years; allowing the nonparent to be a medical power of attorney; and other such factors. *Id.* at 579–80 (citing *Heatzig v. MacLean*, 191 N.C.App. 451, 664 S.E.2d 347, 353–54 (2008)).

■ On the other hand, when the parent has been absent from the child's life for a period of time, other factors become relevant: (1) the length of time the child has been away from the parent; (2) the circumstances of separation; (3) the child's age when care was assumed by the nonparent; (4) the time that elapsed before the parent sought to claim the child; and (5) the frequency and nature of the contact between the parent and the child during the nonparent's custody. *Vinson v. Sorrell*, 136 S.W.3d 465, 470 (Ky. 2004) (citing *Shifflet v. Shifflet*, 891 S.W.2d 392, 397 (Ky. 1995) (Spain, J., concurring)). These factors are non-exhaustive and must be evaluated and determined by a trial court. *Mullins*, 317 S.W.3d at 579 ("While the factors in *Vinson* serve as a helpful guide in evaluating cases where the natural parent has surrendered full possession of the child to a nonparent, we believe these cases should be viewed on a case-by-case basis and that

no specific set of factors must be present in order to find there has been a waiver.").

Whether a parent waives his or her superior custody right is a factual finding that is subject to the clearly erroneous standard of review. *Id.* at 581. "To determine whether findings are clearly erroneous, reviewing courts must focus on whether those findings are supported by substantial evidence." *Id.* (citing *Moore v. Asente*, 110 S.W.3d 336, 354 (Ky. 2003)).

Under these standards, the trial court found clear and convincing evidence that Penticuff waived his superior right to custody. First, the trial court determined that Penticuff "was well aware of the possibility that he was the father." Order, p.11. Penticuff had sexual relations with Mother approximately nine months prior to Child's birth. Penticuff knew of the pregnancy and knew Child's birthdate. "He even testified that upon learning of [Mother's] pregnancy he knew he might possibly be the father." *Id.* at 12. Though Penticuff was told twice by Mother that he was not the father, "he was still well aware there was a chance he was the father[.]" *Id.* Thus, the trial court found clear and convincing evidence existed that Penticuff was "well aware of the possibility that he might be [Child's] father." *Id.*

Having found Penticuff possessed sufficient knowledge that he might be Child's father, thus satisfying the "knowing" requirement of a waiver, the trial court turned its attention to whether Penticuff voluntarily waived his rights to be Child's father. It first found that Penticuff and Child were separated for almost five years before Penticuff filed for custody. This factor weighed in favor of Penticuff waiving his rights, as the first five years of a child's life are formative and permit a child to develop bonds with adults.

The trial court next considered the circumstances surrounding the separation. Penticuff "never deliberately avoided his parental duties. He did not directly cause the separation." Mother told Penticuff twice that he was not Child's father. Penticuff was aware that Miller had joint custody and that Mother held Miller out as Child's father. Penticuff, however, never "pressed the issue with" Mother that he might be Child's father. Penticuff even lived with Mother and Child for a period of time and could have asked her for a paternity test. Accordingly, the trial court found the circumstances surrounding the separation "weigh[ed] slightly toward finding that [Penticuff] waived his superior custody rights." Order, p. 14.

The third factor the trial court considered was Child's age when Penticuff assumed Child's care. Mother has primarily cared for Child for Child's entire life. Miller has been involved in Child's life, to some degree, since Child's birth. This factor, the trial court found, weighed in favor of Penticuff waiving his superior custody rights.

The trial court next considered the time that elapsed before Penticuff sought to claim Child. It is undisputed that Penticuff waited five years before exercising his rights. Thus, this factor also weighed in favor of finding Penticuff waived his superior custody rights.

Finally, the trial court considered the frequency and nature of the contact Penticuff had with Child. While Penticuff lived with Mother and Child for a few months in 2009, there was interaction between Penticuff and Child. When Penticuff and Mother ended their relationship, the contact between Penticuff and Child ceased. Thus, this final factor also weighed in favor of finding Penticuff waived his superior custody rights.

As all five *Vinson* factors favored a finding that Penticuff waived his superior cus-

tody rights, the trial court found clear and convincing evidence supported the same. On appeal, Penticuff argues the trial court erred in its analysis. After careful review of the evidence presented and the trial court's thorough Findings of Fact and Conclusions of Law, we hold that there was not clear and convincing evidence that Penticuff knowingly, intelligently, and voluntarily waived his superior custody right.

▇▇▇ To be the equivalent of an express waiver, there must be a "known right" that is "voluntary[ily] and intentional[ly] surrender[ed.]" *Mullins*, 317 S.W.3d at 578; *see also Vinson*, 136 S.W.3d at 469 (same); *Greathouse*, 891 S.W.2d at 390 ("[T]he trial court must first find the father has made a waiver of his superior right to custody, an intentional or voluntary relinquishment of a known right to custody."). These elements—knowing, voluntary, and intentional—must be established by clear and convincing evidence. *Mullins*, 317 S.W.3d at 578.

▇▇▇ Examining the "known right" element, we do not agree that the evidence established that Penticuff knew of his superior right to custody. To be a known right, Penticuff would have to be more than just generally aware of a potentiality that he was Child's father. In the instant case there were numerous indicators that Penticuff was not the father, especially under the instant facts. Penticuff did perform a reasonable investigation into his general awareness that he was potentially a father. Mother told Penticuff at least twice that Penticuff was not Child's father. One of these conversations was confirmed by a co-worker. Penticuff was aware Mother's husband went to prison around the same time that Child was conceived, thus making it possible that the husband impregnated Mother. Mother told Penticuff after visiting the OB/GYN that Penticuff was not the father. Mother repeatedly held

out to Penticuff and others that Miller was the father. The totality of these circumstances do not culminate in clear and convincing evidence that Penticuff was aware of a known right.

Moreover, Penticuff's desire to exercise his "known right" is most clearly seen in how he reacted to Mother's 2013-placed phone call. Once Mother informed Penticuff that he was the father, Penticuff desired to be a father to Child and had a paternity test conducted to determine the same. He filed to intervene in the instant action. Penticuff and his wife began interacting with Child. Penticuff even testified at the hearing that his wife was babysitting Child during the hearing.

Nothing in the record indicates that Penticuff knowingly slept on his rights. Just the opposite—once the misinformation that Mother gave Penticuff was cleared up, Penticuff took the appropriate actions to establish his paternity and begin having a relationship with his son. In this sense, Penticuff's case is akin to *Moore v. Asente*, 110 S.W.3d 336 (Ky. 2003). There, parents of a child signed a consent to allow the Asentes to adopt the child. The consent stated it was final and irrevocable twenty days after the placement. *Id.* at 353. However, the child's parents were unintentionally misinformed by their attorney about the deadline to revoke consent. Based on this misinformation, they exercised their revocation after the 20-day period had passed. As the consent was based on misinformation, it was not knowingly and voluntarily given. *Id.*

Here, Penticuff was led to believe by Mother that Child was not Penticuff's. Penticuff reasonably relied on Mother's assessment and assurances that Child was not his. Notably, the trial court made the following factual findings:

1. [Penticuff] and [Mother] both worked at Oakwood in 2008. They were in a romantic and sexual relationship in January and February of 2008. [Penticuff] did not wear a condom, but he thought [Mother] was on birth control.

2. [Penticuff] found out [Mother] was pregnant a few weeks after their relationship ended. He was at work and saw [Mother] crying. He approached [Mother] to see what was wrong and [Mother] said she was pregnant. [Penticuff] testified that he immediately thought the child might be his.[ ] He asked if the child was his, and [Mother] said this was unlikely.

3. The day after [Mother's] first doctor's visit [Mother] told [Penticuff] that the child was not his.

4. [Penticuff] knew [Miller] was incarcerated while he and [Mother] were having a sexual relationship. But, [Penticuff] testified that once he learned of [Child's] birth date he never calculated the possible conception date since [Mother] assured him he was not the father.

5. During her pregnancy, [Mother] told Sandra Miller, [Miller's] mother, that Sandra was going to be a grandmother. The implication being that [Miller] was the father.

6. Sandra accompanied [Mother] to her ultrasounds and was at the hospital for [Child's] birth.

7. [Mother] testified that she knew [Penticuff] was the father upon learning [Child's] due date. She claims that she knew [Miller] was not the father because they had not had sex since October 2007. She said she did not tell [Penticuff] or third parties the truth because she was scared of [Miller] and his family.

(Opinion, pp. 3-4) (footnote omitted, alterations added).

"It was within the trial court's discretion to believe these witnesses to the exclusion of other evidence." *Moore*, 110 S.W.3d at 355. These factual findings are based on the witnesses' testimonies, which constitute substantial evidence. *Id.*

Using these factual findings, it cannot be said that clear and convincing evidence was established that Penticuff knew of his superior right to custody. Nor can it be said that this evidence established by clear and convincing evidence that Penticuff had reason to know of his superior right to custody. This case is not like *Boone v. Ballinger*, 228 S.W.3d 1 (Ky. App. 2007), where the mother of the children and the person with whom she was having an affair "both have acknowledged that when Melinda became pregnant with each girl they realized that" wife's husband might not be the father. *Id.* at 3. In that case both the mother and the person with whom she was having an affair took no steps to learn the truth, "and they continued to allow [the husband] to believe that he was the father of the girls and to act in that role." *Id.* at 3-4.

In the instant case, Penticuff was informed by Mother that Penticuff was not the father. Mother held out to Penticuff and all the world that Miller was the father. Penticuff did not *allow* Miller to believe he was the father and to act in that role. Instead, Penticuff believed Miller was the father based on Mother's representations and actions.

Furthermore, Penticuff arguably did not even have a right to challenge Child's paternity when Child was born. Pursuant to *J.N.R. v. O'Reilly*, 264 S.W.3d 587 (Ky. 2008), as Child was born during the marriage of Miller and Mother, Penticuff lacked standing and the family court lacked jurisdiction to determine paternity, custody, and visitation. *J.N.R.* was the law of this Commonwealth until it was over-

ruled three years later by *J.A.S. v. Bushelman*, 342 S.W.3d 850 (Ky. 2011). Thus, for at least the first three years of Child's life, even if Penticuff knew of his status as father, he arguably had no "right" to said status. Accordingly, we find the trial court erred by finding clear and convincing evidence existed that Penticuff had a known right.

■ But assuming, *arguendo*, Penticuff's general awareness of his sexual activity with Mother around the time Child was conceived is sufficient to establish that he knew of his rights, we fail to find that Miller presented clear and convincing evidence that Penticuff made a voluntary and intelligent surrender of his superior right to custody. Under the *Vinson* factors, it cannot be escaped that the circumstances of Penticuff and Child's separation derived predominately from Mother's deceit. *Vinson*, 136 S.W.3d at 470. Penticuff acted swiftly and decisively to establish paternity and interact with his son once Mother's deceit was lifted. This *Vinson* factor works in Penticuff's favor.

■ Furthermore, the passage-of-time factors in *Vinson* do not necessarily work against Penticuff. That five years passed between when Child was born and when Penticuff sought custody is not a determining factor. As the Kentucky Supreme Court has held, "The parent's superior right of custody is not lost to a non-parent ... simply because a child is left in the care of the non-parent for a considerable length of time." *Shifflet v. Shifflet*, 891 S.W.2d 392, 394 (Ky. 1995). The passage of time only enters here if Penticuff was intelligently and voluntarily allowing Miller to act as Child's father. Penticuff's inaction was the direct result of Mother's representations that Miller was the father, though. Her representations and actions that Child was Miller's son were convincing, and Penticuff reasonably relied upon Mother's representations such that his actions were not voluntary. *Cf. Gray v. Commonwealth*, 480 S.W.3d 253 (Ky. 2016) (holding that a person's confession was not voluntary due to the police officers' use of "overwhelming documentary and verbal forensic evidence" that was false).

Thus, Miller failed to meet his burden of proof. The evidence did not establish by clear and convincing evidence that Penticuff intelligently and voluntarily waived a known right. In fact, Penticuff's actions upon learning that he was the father of Child indicate a voluntary and intelligent decision *not* to surrender his superior right to custody. The trial court's conclusion to the contrary is clear error. Accordingly, we hold that the trial court erred by finding Penticuff waived his superior custody rights. We reverse and remand on this issue.

## II. Did the trial court erroneously admit a prior statement in violation of KRE 613?

Penticuff next argues the trial court erroneously admitted a prior statement into evidence in violation of KRE 613. Penticuff's argument is based on objections that were made during the evidentiary hearing that were taken under submission but never ruled upon by Judge Vanover.[1] Following Judge Vanover's recusal from the case, the next trial judge entered an order summarily stating, "[t]his Court *ORDERS* that this case's entire court record shall be admitted into evidence." (Emphasis in original). Penticuff argues this ruling improperly admitted a prior statement that

---

1. As noted below, Judge Vanover presided over the evidentiary hearing but later recused himself from the proceedings.

was detrimental to the trial court's ruling on his waiver of superior custody rights.

While we are not convinced that the order admitting the record into evidence constituted a ruling overruling the objections, we need not resolve this issue as we are reversing and remanding for the trial court to conclude that Penticuff did not waive his superior custody rights. Thus, if there were any error in the evidence's admission, such error was harmless. *CSX Transp., Inc. v. Begley*, 313 S.W.3d 52, 69 (Ky. 2010); Kentucky Rules of Civil Procedure (CR) 60.01.

### III. Did Judge Vanover erroneously vacate his order and recuse himself from the case?

 Judge Vanover, the Family Court Circuit Judge of the 28th Judicial Circuit, presided over the July 1 and 2, 2014-evidentiary hearing in the instant case. Following the hearing, the parties were given time to submit proposed findings and orders. A few months later, counsel for Miller received a revised, proposed order from Penticuff's counsel. The same day the trial court signed an order that was substantially similar to Penticuff's proposed order. Miller filed a motion to vacate the order and have Judge Vanover recuse due to alleged *ex parte* communications and CR 52.01 violation.[2]

Following a response, Judge Vanover entered an order vacating the court's previous findings of fact, conclusions of law and judgment, and recused from the case. The order stated the allegedly improper *ex parte* communication occurred as follows:

> In reviewing the facts of the case, the proposed findings by both parties, and the relevant case law, the Court found that the proposed findings tendered by the Intervening Petitioner Carson Penticuff reflected the facts of the case and most closely represented the applicable and most pertinent case law for these facts. However, the Court found that some of the case law referred to in the Intervening Petitioner's proposed findings should be modified to focus on the case of *Boone v. Ballinger*, 228 S.W.3d 1 (Ky. App. 2007). The Court directed Intervening Petitioner's counsel to make the appropriate change and forward to the Court the revised findings consistent with the Court's instruction. These revised findings were forwarded to the Court and immediately entered by the Court. This action was administrative in nature and, thus, was permitted under SCR 4.300 Cannon 3(B)(7)(a). However, where this Court erred and where and [sic] appearance of the propriety [sic] was potentially created was by not giving the Petitioner/Intervening Respondent Miller an opportunity to respond an [sic] object to the proposed changes prior to the entry of the revised findings of fact. This error creates a potential appearance of impropriety which necessitates recusal by this court and the vacating of the findings of fact that were entered.

Judge Vanover then recused, and the Chief Regional Circuit Judge appointed the Division I Circuit Judge of the 28th Judicial Circuit to preside over the case. That judge issued the rulings that the parties are currently appealing. Penticuff claims Judge Vanover erred by recusing himself from this case. We find no fault in Judge Vanover's decision to recuse himself.

---

**2.** CR 52.01 states in relevant part that **"the court** shall find the facts specifically and state separately its conclusions of law thereon and render an appropriate judgment ...." (Emphasis added).

Supreme Court Rules ("SCR") 4.300 Canon 3(B)(7)(e) prohibits *ex parte* communications between judges and attorneys unless "expressly authorized by law to do so." SCR 4.300 Canon 3(E)(1) further provides that "A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned ...." *See also* KRS 26A.015(2)(e).

 Under these recusal standards, the trial judge is "in the best position to determine whether questions raised regarding his impartiality were reasonable." *Jacobs v. Commonwealth*, 947 S.W.2d 416, 417 (Ky. App. 1997). Thus, we will not "second-guess" a trial court judge's decision to recuse himself. *Id.* As Judge Vanover believed his *ex parte* communication raised an appearance of impropriety, his decision to recuse from the case will not be second guessed by this Court.

 Furthermore, vacating the order was appropriate under these circumstances. CR 59.01(a) permits a new trial due to "[i]rregularity in the proceedings of the court ... by which the party was prevented from having a fair trial." "The trial court is vested with a sound discretion in disposing of a motion for a new trial, and unless that discretion has been abused this court will not disturb its ruling." *Burton v. Spurlock's Adm'r*, 294 Ky. 336, 171 S.W.2d 1012 (1943) (citations omitted). Due to the foregoing recusal and *ex parte* communications, we cannot find the trial court abused its discretion by vacating its order. Thus, we affirm the trial court on these issues.

Having resolved Penticuff's issues, we now turn to Miller's appeal.

### APPEAL 2015-CA-001129-ME

Miller raises three issues in his appeal: (1) did Penticuff's waiver of his parental rights confer parental rights on Miller; (2) did the trial court err by concluding that Mother did not waive her parental rights; (3) if Child has an independent, cognizable legal right to maintain a relationship with Miller who is a "psychological father," can Miller use equities to invoke Child's legal right? We analyze them in order.

### I. Did Penticuff's waiver of his parental rights confer parental rights on Miller?

Miller first argues that because the trial court found Penticuff waived his superior right to custody, it erred by not also finding that that waiver conferred parental rights on Miller. Having already held that the trial court erred by finding Penticuff waived his superior right to custody, this issue is now moot, as Penticuff did not waive his superior right to custody. Accordingly, we decline to address Miller's allegation of error.

### II. Did the trial court err by concluding Mother did not waive her parental rights?

 Miller next argues that the trial court erred by finding Mother did not waive her parental rights. On this issue, the trial court utilized *Mullins v. Picklesimer*, 317 S.W.3d 569, 579 (Ky. 2010), to analyze whether Mother made a knowing and voluntary partial waiver of her parental rights. To make this determination, the trial court utilized the following factual findings in favor of a partial waiver:

- Child was given Miller's last name at birth;
- Mother listed Miller as the father on the birth certificate;
- Miller attended Child's birth; Miller thought he was Child's father;
- Mother did nothing to counter Child's belief that Miller was his father;

- Miller provided some financial support for Child; and
- Mother and Miller originally agreed to joint custody, with Mother being the primary residential custodian.

The trial court then noted the following factual findings worked against finding a partial waiver:

- Mother was scared of Miller and his family;
- Mother had been the subject of past violence and threats of violence by Miller;
- Mother had previously obtained a DVO against Miller; and
- Miller admitted he violated the DVO.

Based on these factual findings, the trial court concluded that Mother's fear of Miller negated any voluntary waiver of her superior custody rights. "A choice between waiving a constitutional right and fearing possible violence is not a free and deliberate choice." (Opinion, p. 19). On appeal, Miller disagrees with the trial court's reliance on some of the factual findings and argues that Mother's credibility was so tenuous that the trial court should not have credited any of her testimony. Miller also argues the trial court utilized an erroneous definition of waiver. We disagree with Miller as to all claims.

First, the trial court's factual findings "can only be set aside by a reviewing court if those findings are clearly erroneous." *Mullins*, 317 S.W.3d at 581 (citations omitted). Findings are clearly erroneous if they are not "supported by substantial evidence." *Id.* Having reviewed the instant record, including the two-day evidentiary hearing, we hold that testimonial evidence supported the trial court's factual findings. Moreover, it is important to note that Mother had nothing to prove in this case. As Child's biological parent she has the superior right to custody, and it was Mil-

ler's burden as the nonparent to prove by clear and convincing evidence that Mother waived her superior right to custody. *Mullins*, 317 S.W.3d at 578. Thus, even if there were some inconsistencies in Mother's testimony and actions over the years, such evidence in this instance does not rise to the level of clear and convincing evidence that she waived her superior rights. Accordingly, the trial court did not err in its factual findings.

Second, the trial court did not err in its waiver standard. Miller argues the trial court should have used the definition found in *Greathouse v. Shreve*, 891 S.W.2d 387 (Ky. 1995), which states as follows:

The common definition of a legal waiver is that it is a voluntary and intentional surrender or relinquishment of a known right, or an election to forego an advantage which the party at his option might have demanded or insisted upon.

*Id.* at 390 (*quoting Barker v. Stearns Coal & Lumber Co*, 291 Ky. 184, 163 S.W.2d 466, 470 (1942)). Instead of using *Greathouse*, the trial court alluded to a *Miranda* waiver standard as a "corollary situation[.]" (Opinion, p. 19) (citing *Matthews v. Commonwealth*, 168 S.W.3d 14, 21 (Ky. 2005) (finding a *Miranda* waiver must be "the product of a free and deliberate choice rather than intimidation, coercion, or deception.").

Miller's argument is a distinction without a difference and an attempt to shift the burden of proof to Mother. Mother had nothing to prove, as she is Child's biological parent and has the superior custody right. Miller, on the other hand, as a nonparent, had to prove by clear and convincing evidence that Mother waived that right. Given the history of domestic violence, Miller's criminal record, and the overall circumstances surrounding Child's conception and entry into the world, we find no error with the trial court's conclu-

sion that Miller failed to meet his burden of proof on the voluntariness-of-the-waiver issue. Given the facts as found by the trial court, there was nothing clear and convincing about Mother's alleged waiver. It could have been a product of coercion as much as it could have been a voluntary waiver. Clear and convincing evidence must be stronger. *See, Fitch v. Burns,* 782 S.W.2d 618, 622 (Ky. 1989).

Accordingly, we find no error with the trial court's factual findings or conclusions of law relating to Mother's alleged waiver of her superior custody rights. Thus, we affirm the trial court's order on this issue.

### III. Did Child have an independent, cognizable legal right to maintain a relationship with his "psychological father" Miller?

 Finally, Miller argues equitable principles demand that because Miller is allegedly a "psychological father" to Child, Child has an independent, cognizable legal right to maintain a relationship with Miller that Miller can assert through equities. The trial court rejected this claim, finding that applicable case law does not recognize a child's independent rights, but instead focuses on whether the biological parents waive their superior custody rights. We agree.

 Miller principally relies upon the doctrine of paternity by estoppel first acknowledged in *S.R.D. v. T.L.B.,* 174 S.W.3d 502 (Ky. App. 2005). That doctrine "estop[s] a legal father from disclaiming paternity." *Ipock v. Ipock,* 403 S.W.3d 580, 588 (Ky. App. 2013). The doctrine uses "equitable grounds, affirming the idea that a person who supports a child financially, physically and emotionally when he knew he was not her biological father should not be permitted to cease that support when it suits him." *Id.* Notably, this doctrine does not extend "to cases where a man who is found not to be a child's father [desires] to estop other parties from excluding him as father[.]" *Id.* Thus, paternity-by-estoppel is a shield to the child to protect against a non-parent who seeks to knowingly sever ties with the child who he or she knowingly held out to be his or her own. It is not a sword for the non-parent to use against the biological parents.

Though his argument is from a novel slant, Miller is asking us to do precisely what paternity by estoppel does not allow. Miller is claiming that Child has an independent, cognizable legal right to a relationship with Miller, and that Miller can use equity principles to assert Child's cognizable legal right in such a way that he estops Mother and Penticuff from excluding him as father. This argument is simply a roundabout way of using the paternity-by-estoppel doctrine as a sword in this paternity fight. Child's two biological parents are seeking to support and care for Child. Child does not need to use the doctrine as a shield to protect himself from a nonparent who is seeking to cease supporting him.

Furthermore, Miller's cited cases are all factually distinguishable. In *S.R.D. v. T.L.B.* there was no biological father seeking to assume the parental role, only a nonparent who sought to no longer pay child support for a child he had supported for years. 174 S.W.3d 502 (Ky. App. 2005). In *Moore v. Asente,* the biological parents signed forms stating their express purpose was to have their son be adopted by the Asentes, they then delivered their son to the Asentes and more than a month later that they sought to regain custody. 110 S.W.3d 336, 361–62 (Ky. 2003). In *Mullins v. Picklesimer* a same-sex couple used artificial insemination to produce the child, thus leaving the child with no biological father. 317 S.W.3d 569 (Ky. 2010). In all of

these cases equitable remedies were necessary to shield the child.

In the instant case we have three adult parties who desire a relationship with Child: (1) Mother, who has always cared for and maintained custody of Child; (2) Penticuff, who is Child's father and has supported Child and sought custody and visitation of same since Mother informed Penticuff of his parental status; and (3) Miller, who has no biological attachment to Child but has in a limited capacity acted as a father figure to Child for the first few years of Child's life. Mother and Penticuff both have the superior custodial rights to Child as they are his biological parents.

As there is no allegation Mother and Penticuff are unfit, under Kentucky statutory and case law they are now tasked with supporting and caring for Child. They "have a fundamental, basic, and constitutional right to raise, care for, and control their own child[ ]." *Mullins*, 317 S.W.3d at 578. Miller's interactions with the Child do not change Child's parents' rights. Accordingly, the trial court did not err by denying Miller's claim on this issue.

## CONCLUSION

We affirm the trial court's order in all respects except its ruling on Penticuff's waiver of his superior custodial rights. Penticuff did not knowingly and voluntarily waive his superior right to custody. Therefore, we reverse and remand for proceedings consistent with this opinion which include setting aside all orders granting Mark Miller custody, visitation, or requiring him to pay child support. Additionally, Penticuff and Miller may file motions to schedule hearings to determine custody, visitation and child support.

ALL CONCUR.