RENDERED:  DECEMBER 4, 2020; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2020-CA-0549-ME

S.R.V.                                                                    APPELLANT


                    APPEAL FROM LIVINGSTON CIRCUIT COURT
v.                  HONORABLE C.A. WOODALL, III, JUDGE
                    ACTION NO. 19-CI-00073


J.S.B.                                                                    APPELLEE


                                    AND
                         NO. 2020-CA-0550-ME

S.R.V.                                                                    APPELLANT


                    APPEAL FROM LIVINGSTON CIRCUIT COURT
v.                  HONORABLE C.A. WOODALL, III, JUDGE
                    ACTION NO. 19-AD-00007


J.S.B. AND L.V.B., A MINOR CHILD                                          APPELLEES

AND
NO. 2020-CA-0551-ME

S.R.V.                                                                                    APPELLANT


                          APPEAL FROM LIVINGSTON CIRCUIT COURT
v.                        HONORABLE C.A. WOODALL, III, JUDGE
                          ACTION NO. 19-AD-00008


J.S.B. AND C.R.B., A MINOR CHILD                                     APPELLEES



OPINION
REVERSING AND REMANDING

** ** ** ** **

BEFORE:  ACREE, JONES, AND K. THOMPSON, JUDGES.

ACREE, JUDGE:  Appellant, S.R.V., brings separate appeals from orders in three

actions originating in Livingston Circuit Court; all three orders were entered on

March 20, 2020.  The first two orders granted adoptions by Appellee, J.S.B., of

S.R.V.'s minor children, L.V.B. and C.R.B.; the third order denied S.R.V.'s

petition for sole custody of her biological children.[1]  After reviewing the records in

---

[1] We shall cite to the record of the custody case, No. 19-CI-00073, as Record 1 (hereafter R.1), the record in the first adoption case, No. 19-AD-00007, as Record 2 (hereafter R.2), and the record in the second adoption case, No. 19-AD-00008, as Record 3 (hereafter R.3).

conjunction with the applicable legal authority, we reverse all three orders and remand the case with instructions to award sole custody of both children to S.R.V.

## BACKGROUND

S.R.V. and J.S.B. married in 2008 and divorced in July 2014. They had no children during the marriage. After the divorce, they reconciled and again began living together, but never remarried. In December 2014, S.R.V. gave birth to L.V.B. In August 2016, she gave birth to C.R.B. J.S.B. helped raise the children. But, S.R.V. and J.S.B. were unable to sustain their relationship. In February 2018, they separated for good. Still, J.S.B. continued to take part in the children's lives. It would be many months before S.R.V. would need to prove, by DNA testing, that J.S.B. is not the biological father of either child.[2]

After J.S.B. moved out, the parties continued jointly to care for the children. Because S.R.V.'s thirteen years of employment as a manager at Cracker Barrel restaurant committed her to long work hours, the children very often stayed at J.S.B.'s place.[3] J.S.B. was drawing disability from 2010 to April 2019, although he worked intermittently. In 2019, an auto accident caused him to leave work

---

[2] The Court is unaware of the identity or identities of the biological father or fathers. However, J.S.B.'s name is listed on each child's birth certificate, and the circuit court found that J.S.B. believed he was their father until 2019 when DNA analysis proved otherwise. S.R.V. testified that J.S.B. was aware he was not her children's father long before DNA testing.

[3] The circuit court concluded the children spent as few as four to five overnights with S.R.V. during the span of at least one month.

entirely. Confirmation that J.S.B. was not the children's father arose in the context of the parties' deteriorating relationship.

In May 2019, a domestic violence incident occurred. J.S.B. broke through the glass front door of S.R.V.'s home and took L.V.B. with him. S.R.V. sustained injuries during the incident. This brought involvement of the Cabinet for Health and Family Services.[4] At least partly based on the children's birth certificates, the Cabinet presumed J.S.B. was their father and, therefore, entitled to joint custody with S.R.V. *See* KRS[5] 405.020(1).

On June 5, 2019, while the Cabinet conducted its work, S.R.V. filed a petition for sole custody alleging she was L.V.B.'s and C.R.B.'s biological mother, but J.S.B. was not their biological father. J.S.B. would not respond to any of S.R.V.'s allegations until November. In July, the Cabinet found cause to remove the children from J.S.B.'s home where they were at that time. They were placed, temporarily, with J.S.B.'s brother and sister-in-law.

---

[4] On May 14, 2019, J.S.B. initiated an action in Livingston District Court to secure a domestic violence and an emergency custody order claiming to be C.R.B.'s and L.V.B.'s father, and two hours later filed a dependency, neglect, and abuse complaint against S.R.V. The next day, S.R.V. initiated similar proceedings in McCracken County where she resided. J.S.B. succeeded in obtaining an immediate emergency custody order on the strength of his allegations. Eventually, the Cabinet found it necessary to take the children away from both parents, placing them with J.S.B.'s relatives from July to September 2019. That is when both parties had completed the Cabinet's plan for reunification, and the Cabinet returned the children to the parties' joint custody.

[5] Kentucky Revised Statutes.

The Cabinet developed reunification plans for J.S.B. and S.R.V. and both diligently pursued those plans with success. The Cabinet returned the children to the home from which it had taken them, that of J.S.B. However, in September 2019, DNA testing proved J.S.B. was not the children's biological father. Faced with that reality, J.S.B. did nothing for about two months.

On November 6, 2019, J.S.B. filed separate petitions to adopt the children pursuant to KRS 199.502 which is captioned, in part, and authorizes "adoption without consent of child's biological living parents[.]" S.R.V. moved to dismiss the adoption actions, but the motions were denied.

A week later, J.S.B. filed a response to S.R.V.'s custody petition, admitting he was not the children's biological father, but alleging he believed he was until DNA testing proved otherwise. He was "seeking custody as a *de facto* custodian" and "reserv[ing] his right . . . to include separate 'claims' for custody" based on allegations of S.R.V.'s "waiver [of her superior constitutional right to custody] and/or unfitness." (R.1 at 19.)

The circuit court held a single evidentiary hearing to address all issues in all three cases in January 2020, making every effort to distinguish the differing standards to be met. On March 20, 2020, the court entered separate judgments in each of the three cases, beginning with the adoptions.

The circuit court entered findings of fact and conclusions of law separately from the adoption judgments themselves. The findings and conclusions held that J.S.B. was fictive kin and therefore authorized to file his adoption petitions without the Cabinet's pre-filing approval. KRS 199.470(4)(a).

The circuit court also made a finding of fact that J.S.B. "does not seek to terminate Respondent [S.R.V.'s] parental rights, only those of the unknown father of each child." (R.2 at 146; R.3 at 145.) J.S.B. presented no evidence against S.R.V. of the existence of any condition identified in KRS 199.502(1)(a) through (1)(j) with respect to either child.[6] Consequently, each of the adoption judgments states: "This Judgment does not affect the parental rights of the biological mother of the child." (R.2 at 152; R.3 at 151.) Neither the adoption judgments nor their underlying findings and conclusions explain why S.R.V.'s parental rights were not terminated as required by KRS 199.520(2).

The same day, the circuit court also addressed S.R.V.'s petition and motion for sole custody. Treating the adoption judgments as preceding its custody ruling, the circuit court found as fact that "[t]he parties have two children," L.V.B. and C.R.B. (R.1 at 66.) The circuit court said:

> The main thing that [S.R.V.] wants is either sole custody
> or to at least have the children live with her primarily. She

---

[6] The circuit court did find, relative to the unknown father(s), that the conditions identified in KRS 199.502(1)(e) and (1)(g) did exist. The parental rights of those unknown fathers were terminated. That part of the judgment is not an issue in these appeals.

-6-

believes that [J.S.B.] and everyone else has put obstacles in her way to keep her away from her children. To her credit, [S.R.V.] worked hard to provide for her family.

(R.1 at 70.) The circuit court then conducted a best interests analysis to determine custody pursuant to KRS 403.270.

The court held J.S.B. had not rebutted the presumption of joint custody but did overcome the presumption of equal timesharing. J.S.B. was designated primary residential parent and awarded timesharing according to the visitation guidelines for that judicial circuit. S.R.V. appealed both adoption judgments and the order denying her sole custody of her children.

## ANALYSIS

No one even slightly familiar with domestic relations law could deny that this case risks giving credence to the adage "hard cases make bad law." This is a hard case because, on its face, compassion would seem to lie with a man willing to be a father when no one else is, and against a mother who took advantage of his willingness by hiding the truth of her children's paternity. But this is not a novel or a soap opera. Courts must decide cases by dispassionately applying the law, even when doing so cuts against the grain of their compassion.

*The judgments of adoption*

Reversing the adoption judgments is an easy decision. As noted, those judgments violate KRS 199.520. That statute states, in pertinent part:

> Upon granting an adoption, all legal relationship between the adopted child and the biological parents shall be terminated except the relationship of a biological parent who is the spouse of an adoptive parent.

KRS 199.520(2). "Our responsibility is, as the [circuit] court's was, to enforce KRS 199.520(2), as it is written, without passion or prejudice. Where it applies, we must do so." *S.J.L.S. v. T.L.S.*, 265 S.W.3d 804, 819 (Ky. App. 2008).

It is clear from this statute the legislature intended to impose a predicate upon every adoption by someone not married to one of the parents. That predicate is the termination of "all legal relationship between the adopted child and the biological *parents*[,]" and that means both parents.[7] *Id.* at 820 (emphasis added) (quoting KRS 199.520(2)). "An adoption without the consent of a living biological parent is, in effect, a proceeding to terminate *that parent's* parental rights." *B.L. v. J.S.*, 434 S.W.3d 61, 65 (Ky. App. 2014) (emphasis added) (citation omitted).

---

[7] Although KRS 446.020(1) allows this Court to interpret the plural word "parents" as though the legislature had used the singular form, that rule is secondary to a more fundamental one. As the Supreme Court said just a few years ago, "it is fundamental that 'words of a statute shall be construed according to their common and approved usage. [KRS 446.080(4)] . . . In addition, the courts have a duty to accord statutory language its literal meaning *unless to do so would lead to an absurd or wholly unreasonable result.*'" *Commonwealth v. Wright*, 415 S.W.3d 606, 608 (Ky. 2013) (emphasis added) (quoting *Johnson v. Branch Banking and Trust Co.*, 313 S.W.3d 557, 559 (Ky. 2010)). Construing the word "parents" in the plural here does not lead to an absurdity; reading it in the singular would lead to an absurd result.

Further support for this obvious conclusion is found in KRS 199.500 which says, in pertinent part: "An adoption shall not be granted without the voluntary and informed consent, as defined in KRS 199.011, of . . . the mother of the child born out of wedlock . . . except that the consent of the living parent or parents shall not be required if . . . [t]he parental rights of the *parents* have been terminated under KRS Chapter 625[.]" KRS 199.500(1)(b) (emphasis added).

Finally, KRS 199.502 itself indicates the adoption predicate is termination of both parents' rights. It says: "Notwithstanding the provisions of KRS 199.500(1), an adoption may be granted without the consent of the biological living *parents*" but only if the adoption petitioner pleads and proves as to each parent that he or she allowed to exist at least one of the conditions set out in the statute with respect to each child. KRS 199.502(1)(a)-(j) (emphasis added).

J.S.B. neither pleaded nor proved any condition to justify terminating S.R.V.'s parental rights against her will, and the circuit court expressly declined to terminate S.R.V.'s parental rights. Rather, as accurately stated by S.R.V., "[t]he trial court essentially took two parties proven to be incapable of harmony – dangerously so at times – and insured they would be linked for years despite the fact that both chose to no longer be linked by marriage or another relationship." (Appellant's brief, p. 11.)

We have considered J.S.B.'s argument that "the introduction of [the concept of] 'fictive kin' must negate some of the application of KRS 199.520(2)" but find it unpersuasive. J.S.B.'s status as fictive kin allowed his pursuit of adoption without participation by the Cabinet. It did not change any of the statutes upon which this Opinion is based.

Both adoption judgments must be reversed because J.S.B. failed to establish, and the circuit court failed to find, grounds for terminating S.R.V.'s parental rights, the prerequisite to granting J.S.B.'s adoption petitions.

*The custody order*

As just explained, J.S.B. did not become the adoptive father of the children. The custody order is premised on the erroneous finding of fact that J.S.B. had just achieved status as a parent of the two children equal to that of S.R.V. That finding was clearly erroneous and must be set aside. CR[8] 52.01. That means the custody action was litigated between a parent and a non-parent. And that means S.R.V. was entitled to sole custody of her children. *Meinders v. Middleton*, 572 S.W.3d 52, 60 (Ky. 2019) (citation omitted) ("So long as a parent is fit, there will normally be no reason for the [s]tate to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children.").

---

[8] Kentucky Rules of Civil Procedure.

Consequently, we cannot affirm the custody order on the grounds identified in the circuit court's application of law. However, that does not end the analysis on review. J.S.B. argues alternative grounds upon which this Court might affirm the circuit court. *Emberton v. GMRI, Inc.*, 299 S.W.3d 565, 576 (Ky. 2009) (citations omitted) ("appellate court may affirm a lower court's decision on other grounds as long as the lower court reached the correct result"). He argues the custody order should be affirmed on the basis "of 'waiver' of the mother's superior rights to custody . . . ." (Appellee's brief, p. 11.) We disagree.

*Mother did not waive her superior rights to custody*

As noted at the beginning of this analysis, this is a hard case and it is said that "hard cases make bad law." Among the best explanations of this aphorism is one given us by Justice Oliver Wendell Holmes, Jr. who noted the common thread running through "hard cases" and so-called "great cases" alike. He said:

> Great cases, like hard cases, make bad law. For great cases are called great, not by reason of their real importance in shaping the law of the future, but because of some accident of immediate overwhelming interest which appeals to the feelings and distorts the judgment. These immediate interests exercise a kind of hydraulic pressure which makes what previously was clear seem doubtful, and before which even well settled principles of law will bend.

*Northern Securities Co. v. United States*, 193 U.S. 197, 364, 24 S. Ct. 436, 468, 48 L. Ed. 679 (1904) (Holmes, J., dissenting).

-11-

Hard cases become "great cases" when a reviewing court succumbs to the "kind of hydraulic pressure" Justice Holmes identified, so that the court creates new law "before which even well settled principles of law will bend." *Id. Mullins v. Picklesimer* is this kind of great case. 317 S.W.3d 569 (Ky. 2010).

When *Mullins* was rendered, same-sex couples were excluded from "the recognition, stability, and predictability marriage offers, [such that] their children suffer[ed] the stigma of knowing their families [we]re somehow lesser." *Obergefell v. Hodges*, 576 U.S. 644, 668, 135 S. Ct. 2584, 2600, 192 L. Ed. 2d 609 (2015). The times themselves supplied the pressure. The nature of family relationships had been changing for a long time. *Compare Brooks v. Collins*, 74 Ky. (11 Bush) 622, 626 (1876) ("*family* as defined by Bouvier is 'father, mother, and children'") *with Taylor v. Louisiana*, 419 U.S. 522, 535 n.17, 95 S. Ct. 692, 700 n.17, 42 L. Ed. 2d 690 (1975) (noting the "evolving nature of the structure of the family unit") *and Pinto v. Robison*, 607 S.W.3d 669, 677 (Ky. 2020) (noting "the changing dynamics of families in today's society").

The law had not kept pace with change. Same-sex partners could not marry, and that legality impeded much, including the ability of a same-sex couple to co-parent a child as their own. *Mullins* addressed the problem with new law.

We need not address *Mullins* at length except to say that, in the pre-*Obergefell* era, it established a new legal ground to challenge the fundamental right

-12-

of a parent to raise her child as she deems to be in the child's best interest. *Troxel v. Granville*, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000). The new legal ground was a kind of subcategory of an old one – waiver.

In addition to what we must now call a "complete waiver" of the fundamental right, *Mullins* allowed that, under some select circumstances such as the Court found to exist in that case, there need be only "a waiver of *some part* of the superior parental right, which would essentially give the child another parent in addition to the natural parent." *Mullins*, 317 S.W.3d at 579 (emphasis added). Justice Cunningham called it "partial waiver" and warned of the mischief it could cause.[9] *Id.* at 581 (Cunningham, J., concurring in part and dissenting in part).

The 4-3 majority Opinion in *Mullins* does not define what "some part" of the superior parental right entailed. The case merely lists factors to consider when determining whether a partial waiver occurred. *Id.* at 575-81. The Supreme Court gleaned these factors exclusively from cases of other jurisdictions that addressed the same pre-*Obergefell* legal impediments preventing same-sex couples from raising a child together in those states.

_____

[9] Justice Cunningham expressed concern that the Court was, "by judicial edict, just open[ing] wide the door and wav[ing] everyone in who wishes to parent a child." *Mullins*, 317 S.W.3d at 583 (Cunningham, J., concurring in part and dissenting in part). The majority responded directly to Justice Cunningham's concern, stating: "the child was conceived through artificial insemination and brought into the world upon agreement of the parties to parent the child together" and said such factors as "[t]his would distinguish" the circumstances of *Mullins* from others. *Id.* at 576-77.

-13-

Examining the list of factors leaves the strong impression that "partial waiver" is applicable only "when the child was conceived by artificial insemination with the intent that the child would be co-parented by the parent and her [same-sex] partner . . . ." *Id.* at 575. And partial waiver may be further limited to cases in which there is a "written agreement" or similar writing as proof "to show [the biological parent's] intent to confer parental rights" on the same-sex, non-parent. *Id.* at 580-81. In this case there was no proof of those factors, or of the general circumstances that made a pre-*Obergefell* Opinion necessary, or seem necessary, in the first place.

If not impossible, it is surely difficult to believe *Mullins* would have been decided identically in a post-*Obergefell* America. That is part of the reason for limiting its application to a fact pattern that cannot be repeated today. *Obergefell* released the "hydraulic pressure which makes what previously was clear seem doubtful" and under which *Mullins* was decided. *Northern Securities*, 193 U.S. at 364, 24 S. Ct. at 468 (Holmes, J., dissenting). This Court has the luxury today, without that pressure, to reiterate "what previously was clear" – the superiority of the fundamental right of a parent to raise her children in a manner she believes to be in their best interests.

It remains so that "[u]nder our current statutory scheme, non-parents may attain standing to seek custody or visitation of a child only if they qualify as

*de facto* custodians, if the parent has waived her superior right to custody, or if the parent is conclusively determined to be unfit." *Truman v. Lillard*, 404 S.W.3d 863, 868 (Ky. App. 2012) (citing *Mullins*, 317 S.W.3d at 578). Although S.R.V. initiated the custody action, J.S.B. responded by asserting his claim that he was a *de facto* custodian, that S.R.V. was unfit, and that S.R.V. had waived her superior parental rights.

The circuit court correctly concluded that "[*d*]*e facto* custodianship is not a factor in this case." We previously held that J.S.B. did not allege unfitness, nor did he present any evidence at the joint hearing on the three cases to suggest S.R.V. was unfit. Now, we have concluded that there was not sufficient evidence to affirm the custody order on the alternative ground that S.R.V. waived her superior fundamental right to parent her children.

"[A] generation . . . may change their laws and institutions to suit themselves. [N]othing then is unchangeable *but the inherent and unalienable rights of man.*"[10] *See also Commonwealth v. Wasson*, 842 S.W.2d 487, 503 (Ky. 1992), *overruled on other grounds by Calloway Cty. Sheriff's Dep't v. Woodall*, 607 S.W.3d 557 (Ky. 2020) (Combs, J., concurring) (emphasis added) ("[T]he

---

[10] Letter from Thomas Jefferson to Major John Cartwright (June 5, 1824), *in* THE LIFE AND SELECTED WRITINGS OF THOMAS JEFFERSON: INCLUDING THE AUTOBIOGRAPHY, THE DECLARATION OF INDEPENDENCE & HIS PUBLIC AND PRIVATE LETTERS 652 (Adrienne Koch & William Peden, eds., Reprint ed. 1998).

Constitution embraces—yea, embodies—the *immutable values* of individual freedom, liberty, and equality."). The Constitution did not create these unalienable and unchangeable rights. THE DECLARATION OF INDEPENDENCE para. 2 (U.S. 1776) (all humans "are endowed by their Creator with certain unalienable Rights"). And as much as we revere that hallowed scripture, the Constitution remains, as do all laws, subordinate and subservient to the immutable rights and liberties and freedoms it exalts and protects.

To be sure, the Constitution "provides *heightened protection* against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 720, 117 S. Ct. 2258, 2267, 138 L. Ed. 2d 772 (1997) (citations omitted). "The liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court." *Troxel*, 530 U.S. at 65, 120 S. Ct. at 2060. S.R.V.'s "liberty interest in rearing [her] children without government interference" is specifically at stake here. *Walker v. Blair*, 382 S.W.3d 862, 866 (Ky. 2012).

The temptation to judge what, from outside the biological parent's sphere, appears to be in the best interests of her children is great. Was S.R.V. wrong when she decided it was in her children's best interests to allow J.S.B. to be a part of their lives, even if she did so by some deception? After the violence

-16-

J.S.B. visited upon her home and herself, was S.R.V. wrong when she decided J.S.B. needed to have less power over her children, even if she did so by telling the truth? Neither this Court, nor any court, is entitled to answer such questions. That is because, although S.R.V. may be imperfect as a parent (as all parents are), no one has shown her to be unfit or to have waived her right to claim the fundamental right parents cherish most dearly. That is the rule and lesson of *Troxel*.

## CONCLUSION

For the foregoing reasons, we reverse the Livingston Circuit Court's March 20, 2020 judgments of adoption of both L.V.B. and C.R.B. We also reverse the Livingston Circuit Court's March 20, 2020 order awarding joint custody and remand with instructions that sole custody be awarded to S.R.V.

JONES, JUDGE, CONCURS.

THOMPSON, K., JUDGE, CONCURS IN PART, DISSENTS IN PART, AND FILES SEPARATE OPINION.

THOMPSON, K., JUDGE, CONCURRING IN PART AND DISSENTING IN PART: I regretfully concur as to the majority Opinion's decision to reverse the adoption as I agree with the majority's reading of Kentucky Revised Statute (KRS) 199.520 and KRS 199.011. As the Livingston Circuit Court relied upon J.S.B.'s status as the adoptive parent of the children in deciding it was in the children's best interest to award him joint custody and status as the

children's primary residential parent and S.R.V. timesharing, I agree that it is appropriate to reverse the custody decision. However, I respectfully dissent as to the majority Opinion mandating that on remand the circuit court must award sole custody of the children to S.R.V.

I believe it would be wholly appropriate for the circuit court to consider on remand whether J.S.B. should be entitled to share custody of the children on the basis that S.R.V.'s actions constituted waiver of her superior parental rights. The majority Opinion spends some time trying to limit the application of *Mullins v. Picklesimer*, 317 S.W.3d 569 (Ky. 2010), which allows the partial waiver of parental rights, on the basis that *Mullins* should only have application to same sex couples who could not marry or jointly adopt, and that when *Obergefell v. Hodges*, 576 U.S. 644, 135 S.Ct. 2584, 192 L.Ed.2d 609 (2015), allowed for same sex marriage, the *Mullins* decision was no longer needed at all. However, waiver is not new and there continue to be partners (both same sex and opposite sex) who raise children together without the bonds of marriage. What constitutes a family is indeed changing and more children than ever are born out of wedlock.

I disagree that as an intermediate appellate court we have the authority to reinterpret what the Kentucky Supreme Court did in *Mullins* and essentially determine that it was somehow overruled *sub silentio* even though it continues to

be widely cited by our Courts and relied upon post-*Obergefell*. Justice

Cunningham's concerns as part of the minority when *Mullins* was decided do not

authorize a panel of our Court to act at odds with established and controlling

precedent. Until the Kentucky Supreme Court speaks and directs otherwise, we

need to follow *Mullins*. Rules of the Supreme Court (SCR) 1.030(8)(a); *Power v.*

*Commonwealth*, 563 S.W.3d 97, 98 (Ky.App. 2018). Therefore, it is appropriate to

allow the circuit court to consider whether joint custody may still be appropriate on

the alternative grounds of waiver.

A waiver of parental rights need not be formal or written, but to be

equivalent to an express waiver, the parent must knowingly, voluntarily, and

intentionally waive his or her superior right to custody as established by clear and

convincing evidence. *Mullins*, 317 S.W.3d at 578; *Penticuff v. Miller*, 503 S.W.3d

198, 205 (Ky.App. 2016). "[W]aiver [of a parent's superior right to custody] may

be implied 'by a party's decisive, unequivocal conduct reasonably inferring the

intent to waive[.]'" *Moore v. Asente*, 110 S.W.3d 336, 360 (Ky. 2003) (quoting

BLACK'S LAW DICTIONARY 1574 (7th ed. 1999)). However, "statements and

supporting circumstances [of an implied waiver] must be equivalent to an express

waiver to meet the burden of proof." *Greathouse v. Shreve*, 891 S.W.2d 387, 391

(Ky. 1995). "Whether a parent waives his or her superior custody right is a factual

finding that is subject to the clearly erroneous standard of review." *Penticuff*, 503

S.W.3d at 204 (citation omitted).

In *Mullins*, the Court considered *Heatzig v. MacLean*, 664 S.E.2d 347

(N.C. Ct. App. 2008), to be helpful in its analysis, explaining in that decision the

Court:

> couched its analysis in terms of whether the natural
> parent had acted in a manner inconsistent with her
> constitutionally protected status as a natural parent . . .
> [and] noted that the focus should be on "whether the
> legal parent has voluntarily chosen to create a family unit
> and to cede to the third party a sufficiently significant
> amount of parental responsibility and decision-making
> authority to create a parent-like relationship with his or
> her child."

*Mullins*, 317 S.W.3d at 580 (quoting *Heatzig*, 664 S.E.2d at 354). The *Mullins*

Court also relied on the *Heatzig* factors:

> (1) both plaintiff and defendant jointly decided to create a
> family unit; (2) defendant intentionally identified
> plaintiff as parent; (3) the sperm donor was selected
> based upon physical characteristics similar to those of
> plaintiff; (4) the surname of plaintiff was used as one of
> the child's names; (5) plaintiff participated in the
> pregnancy and the birth of the child; (6) there was a
> baptism ceremony where both plaintiff and defendant
> were identified as parents; (7) plaintiff was identified as a
> parent on school forms; (8) they functioned together as a
> family unit for four years; (9) after the relationship
> between plaintiff and defendant ended, the defendant
> allowed plaintiff the functional equivalent of custody for
> three years; (10) defendant encouraged, fostered, and
> facilitated an emotional and psychological bond between
> plaintiff and the child; (11) plaintiff provided care and

> financial support for the child; (12) the child considered plaintiff to be a parent; (13) plaintiff and defendant shared decision-making authority with respect to the child; (14) plaintiff was a medical power of attorney for the child; (15) the parties voluntarily entered into a parenting agreement; and (16) defendant intended to create between plaintiff and the child a permanent parent-like relationship.

*Id.* (quoting *Heatzig*, 664 S.E.2d at 353-54).

I believe similar factors to those set out in *Mullins* could support waiver in this case, but this is a factual determination properly left to the circuit court and it would be inappropriate for us to affirm the custody decision based upon this alternative ground without allowing the circuit court to resolve this factual issue. However, I discuss some grounds that may be applicable to such a decision on remand.

S.R.V. essentially used the men who she knows were the biological fathers of the children as sperm donors. While they could have placed themselves on the putative father registry or taken some action to protect their rights, they chose to waive those rights by not seeking any involvement with the children, thereby allowing J.S.B. to function as a father. As noted in a footnote, the part of the involuntary adoption case which terminated the parental rights of the unknown fathers of the children is not an issue in the appeals because there were appropriate grounds for terminating the biological fathers' parental rights because they failed

to provide essential parental care and the essentials of life for the children pursuant to KRS 199.502(1)(e) and (g).

There is substantial evidence to support the circuit court's findings in the custody order which point to waiver by S.R.V. even if the circuit court did not make its ruling based on waiver. Among them are that: (1) J.S.B. was present at the birth of both children and S.R.V. listed him as the father on both birth certificates; (2) S.R.V. admitted the two children are "his kids too" and "[he] is the only father they have ever known"; (3) S.R.V. admitted that she never told anyone that J.S.B. was not the father; (4) S.R.V. wants J.S.B. to continue as the father of the children; (5) J.S.B. was unaware that he was not the biological father of the children until the paternity tests in the district court cases which excluded him in September 2019; (6) J.S.B. was the primary caretaker for the children by the agreement of the parties while S.R.V. worked and he performed parental duties; (7) after S.R.V.'s final separation from J.S.B., the children stayed with J.S.B. more than S.R.V., including overnights based upon her work schedule and his greater availability; and (8) the children spent the majority of their time with J.S.B. and were with S.R.V. as few as four to five overnights a month. I also note that J.S.B. points to additional evidence the circuit court could have considered in determining whether waiver applied, including the following: (1) S.R.V. thought it would be best if J.S.B. raised the children; (2) J.S.B. signed the birth certificates and

acknowledged that he was the father; (3) S.R.V. and J.S.B. had a joint baby shower and all of his family was invited, they all participated in the shower, and his family was also present at the hospital for the birth of each child; (4) S.R.V. sent J.S.B. father's day cards from the children throughout the years; (5) social worker Devon Mounts testified that the children identified J.S.B. as the father and J.S.B. was ready, willing, and able to care for the children; (6) S.R.V. acknowledged that the children did not know that they were not J.S.B.'s children and it would most likely cause them emotional harm if they discovered the truth and she had no intention of telling them otherwise; and (7) both children have J.S.B.'s surname and S.R.V. has no intention of changing their names.

The only real difference between the situation here and that with same sex couples where either a child was adopted or born of one member of the couple but both acted as the parents, is that J.S.B. did not know he was not the biological parent until later. However, once J.S.B. knew, he had a choice to continue to act as the children's father or to disclaim responsibility. By continuing to act as a father, J.S.B. accepted S.R.V.'s waiver, essentially ratified it, and could potentially be entitled to custody rights to the children.

Accordingly, I concur in part and dissent in part.

BRIEF FOR APPELLANT:

Alisha K. Bobo
Paducah, Kentucky

BRIEF FOR APPELLEE J.S.B.:

Jennifer Sacharnoski Nelson
Princeton, Kentucky